Opinion issued March 15, 2007


















In The

Court of Appeals

For The

First District of Texas






NO. 01-04-01026-CV

 _________


TAMMY RENEE WHITWORTH, Appellant


V.


DOUGLAS WAYNE WHITWORTH, Appellee






On Appeal from the 257th District Court

Harris County, Texas

Trial Court Cause No. 2000-64428






OPINION ON REHEARING


 Carol Whitworth, the intervenor, filed a motion for rehearing. We
withdraw our Opinion and Judgment of November 22, 2006 and grant the
motion for rehearing.

 Appellant, Tammy Renee Whitworth, challenges the trial court's final
decree of divorce that named intervenor, Carol Whitworth, sole managing
conservator of Tammy's minor child, K.C. In two issues on appeal, Tammy
argues that the trial court erred (1) in failing to name her as joint managing
conservator and (2) in giving her less than a standard possession order. We
affirm.

Background

 Tammy and Douglas Whitworth married in August 2000, but
separated in September or October 2000. Douglas filed an original petition
for divorce a couple of months later. A second original petition for divorce
was filed by Tammy, and the trial court signed an order of consolidation. 
Tammy and Douglas's only child, K.C., was born on June 13, 2001. (1) By
order entered November 30, 2001, Tammy was given custody of K.C. and
Douglas was given two hours a day visitation five days a week and ordered
to pay $500 a month to Tammy as temporary spousal support. Three months
later, Tammy filed a motion for enforcement of temporary spousal support. 

 Almost one year after Tammy was given custody, the trial court heard
the parties' application for temporary custody orders pending the divorce. 
Although we have no transcript of the hearings held on a Friday and
Monday, testimony from the divorce hearing indicates that the trial court
heard testimony that Tammy had repeatedly denied Douglas access to K.C.,
had alleged that Douglas sexually abused A.C., K.C.'s half-sister, and feared
his unsupervised visitation with K.C. Douglas repeatedly denied these
allegations. The testimony further indicated that, during the course of the
earlier hearing, the trial court ordered Tammy to have her mother, Gayle
Cash, bring K.C. to the court and warned her numerous times that she would
be held in contempt if she did not, but Tammy did not have K.C. brought to
the court. The docket sheets reflect that, at the end of the Friday hearing, the
trial court found Tammy in contempt and sentenced her to 10 days in jail for
"continuous parental alienation against father through repeated
visitation/access denials and behavior in court."

 On the same day as the Friday hearing, Carol Whitworth, Douglas's
mother, filed an original petition for intervention stating that she was K.C.'s
paternal grandmother and requesting that K.C. be placed in her care on "a
temporary and/or permanent basis." 

 Tammy stayed in jail for the weekend and appeared in court for the
continuation of the hearing on Monday. At the end of the hearing, the trial
court entered an order appointing Carol, the intervening grandparent, as
temporary sole managing conservator of K.C. and Tammy and Douglas as
temporary possessory conservators with only supervised rights of possession
for four hours every other week through the SAFE Supervised Visitation
Program of the Victim's Assistance Center ("SAFE"). The docket sheet
from the Monday hearing stated that Tammy and her mother, Gayle Cash,
had "exercised continuous parental alienation against father through
repeated visitation/access denials and behavior in court during this hearing"
and that supervised visitation was ordered because of the seriousness of the
allegations against Douglas and the fact that the trial court deemed Tammy a
"flight risk with child as demonstrated by her behavior to court since
10/18/02 [the Friday hearing]." The trial court ordered Dr. Edward
Silverman to conduct psychological evaluations of Tammy, Douglas, and
Carol. Both Tammy and Douglas were ordered to pay Carol child support
for K.C. and to ensure the maintenance of health insurance for K.C. The
trial court also enjoined Tammy from telephoning Carol and from going
within 50 feet of Carol's residence. Four months later, the trial court also
ordered that Tammy and Douglas were enjoined from taking photos of K.C.
while she was at SAFE. 

 More than one year later, on April 13, 2004, the trial court heard
evidence to determine custody of two-year-old K.C. At the time of trial,
Douglas was not seeking primary custody of the child. The trial court
entered a final decree of divorce stating that neither Tammy nor Douglas
would be the managing conservator of K.C. because it "would not be in the
best interest of the child because such appointment would significantly
impair the child's physical health or emotional development." 

 The decree ordered that Carol, the intervening grandparent, be
appointed as the sole managing conservator of K.C. The trial court found
that a standard possession order for either Tammy or Douglas was
inappropriate and not in the best interest of K.C. It ordered that Tammy
continue to have only supervised visitation for four hours every other
Saturday and that Douglas have supervised visitation to be determined by his
mother, Carol. The trial court entered no findings of fact or conclusions of
law. Two months later, Tammy filed a motion for new trial, which the trial
court denied. Tammy appeals from the trial court's custody determination in
the divorce decree.


Standing

We first review Carol's standing to intervene in this action. The parties
did not raise standing in their initial set of briefs nor was a motion to strike
the intervention filed with the trial court, but we may address it sua sponte. (2)
We review a court's determination of a grandparent's standing to intervene
in a pending divorce proceeding under an abuse of discretion standard. See
Tex. Fam. Code Ann. § 102.004(b) (Vernon Supp. 2006). A trial court
abuses its discretion when its decision is arbitrary or unreasonable. See
Gillespie v. Gillespie, 644 S.W.2d 449, 451 (Tex. 1982). 

 Carol has standing to intervene in this action. Generally, an intervenor
must show standing to maintain an original suit in order to intervene.
Segovia-Slape v. Paxson, 893 S.W.2d 694, 696 (Tex. App.--El Paso 1995,
no writ); McCord v. Watts, 777 S.W.2d 809, 812 (Tex. App.--Austin 1989,
no writ). This showing requires that the intervenor have some present
justiciable interest in the subject matter of the suit. Segovia-Slape, 893
S.W.2d at 696. However, an intervenor in a suit affecting the parent-child
relationship does not need to plead or prove the standing required to institute
an original suit because managing conservatorship is already in issue. Id. 
Specifically, section 102.004(b) of the Family Code provides that the trial
court may grant a grandparent leave to intervene in a pending suit filed by a
party authorized under section 102 of the Family Code to bring an original
suit affecting the parent-child relationship. Section 102.004(b), as it existed
at the time that Carol and Douglas filed their divorce, provided that:

 An original suit requesting possessory conservatorship may not
be filed by a grandparent or other person. However, the court
may grant a grandparent or other person deemed by the court
to have had substantial past contact with the child leave to
intervene in a pending suit filed by a person authorized to do so
under this subchapter. 


Tex. Fam. Code Ann. § 102.004(b) (Vernon Supp. 2006) (emphasis added); 
see In re M.A.M., 35 S.W.3d 788, 790 (Tex. App.--Beaumont 2001, no pet.)
(holding that trial court did not abuse its discretion by allowing the
intervention of biological grandparent under section 102.004(b)); McCord,
777 S.W.2d at 812 ("It has been held that, as a matter of law, grandparents
possess a justiciable interest in their grandchild" and that grandparents who
intervene in a proceeding are not required to plead and prove the
requirements for standing to bring an original action.). This subchapter
applies to interventions seeking managing conservatorships as well as those
seeking possessory conservatorships. In re Hildago, 938 S.W.2d 492, 496
(Tex. App.--Texarkana 1996, no writ).

 This relaxed standing rule for intervention promotes the overriding
policy in all suits affecting the parent-child relationship, that of protecting
the best interest of the child. Segovia-Slape, 893 S.W.2d at 696; see also In
the Interest of K.T. & M.T., 21 S.W.3d 925, 927 (Tex. App.--Beaumont
2000, no pet.) ("Sound policy underlies the Legislature's creation of a
relaxed standing rule subject to court discretion for intervention in an
existing suit. Where a suit is already pending, concern for the privacy of the
parties is subordinate to the overriding concern for the best interest of the
children."); Harrison v. Harrison, 734 S.W.2d 737, 740-41 (Tex.
App.--Eastland 1987, no writ) ("There is a significant difference between
filing an original proceeding which could disrupt the children's relationship
with their parents and intervening in a pending suit in which that relationship
had been sufficiently interrupted to cause the filing of a suit requiring the
courts to decide what decree would be in the children's best interest.");
Young v. Young, 693 S.W.2d 696, 698 (Tex. App.--Houston [14th Dist.]
1985, writ dism'd) ("Intervention under these circumstances may enhance
the trial court's ability to adjudicate the cause in the best interests of the
child."). Thus, while the statutory scheme assures that grandparents are not
entitled to disrupt the child's family life and initiate suits for managing
conservatorship except in limited circumstances, once the child's best
interest is before the court and being litigated, the trial court has discretion to
determine that the intervention by a grandparent may enhance the trial
court's ability to adjudicate what is in the best interest of the child. McCord,
777 S.W.2d at 812. 

 In the instant case, Tammy and Douglas had filed a suit for divorce. 
As K.C.'s biological parents, pursuant to section 102 of the Family Code,
they were both authorized to file an original suit affecting the parent-child
relationship. Allegations of inappropriate and questionable behavior by both
parents had been asserted, raising the question of parental custody. It was in
this context that Carol filed a petition for intervention. Carol's petition was
filed on the same day that the trial court found Tammy in contempt and
sentenced her to 10 days in jail. Carol is K.C.'s undisputed paternal
grandmother and contends that her appointment as managing conservator
would be in the child's best interest. Accordingly, the trial court did not
abuse its discretion in finding that she had standing to intervene in this suit. 
See In re M.A.M., 35 S.W.3d at 790. (3)

Sole Managing Conservatorship


 In two issues, Tammy argues that the trial court erred by appointing
Carol as the sole managing conservator with primary physical possession of
K.C. and giving Tammy a less than standard possession order. Tammy
contends that awarding managing conservatorship to Carol under the facts of
this case violated section 153.131 of the Family Code and the Due Process
Clause of the United States Constitution. See Tex. Fam. Code Ann. §
153.131 (Vernon 2002).

Standard of Review 

 We review a trial court's determination of conservatorship for an
abuse of discretion. Gillespie, 644 S.W.2d at 451. The test for an abuse of
discretion is whether, in the opinion of the reviewing court, the trial court's
rulings were arbitrary or unreasonable. Id. The mere fact that a trial judge
may decide a matter within his discretion in a different manner than an
appellate judge in a similar circumstance does not demonstrate that an abuse
of discretion has occurred. Sw. Bell Tel. Co. v. Johnson, 389 S.W.2d 645,
648 (Tex. 1965). An abuse of discretion does not occur as long as some
evidence of a substantive and probative character exists to support the trial
court's decision. Lide v. Lide, 116 S.W.3d 147, 152 (Tex. App.--El Paso
2003, no pet.).

Section 153.131 of the Family Code

 There is a strong presumption that the best interest of a child is served
if a natural parent is appointed as a managing conservator. Tex. Fam. Code
Ann. § 153.131(a) (Vernon 2002); Brook v. Brook, 881 S.W.2d 297, 299
(Tex. 1994); In re De La Pena, 999 S.W.2d 521, 527 (Tex. App.--El Paso
1999, no pet.); In the Interest of A.D.H., 979 S.W.2d 445, 447 (Tex.
App.--Beaumont 1998, no pet.). Section 153.131(a) statutorily provides for
the appointment of the parent as sole managing conservator or the parents as
joint managing conservators, unless the court finds the appointment would
not be in the best interest of the child because it would significantly impair
the child's physical health or emotional development. Tex. Fam. Code
Ann. § 153.131(a).

 For the court to award managing conservatorship to a non-parent
under section 153.131, the non-parent must prove by a preponderance of
credible evidence that appointing the parent as a managing conservator
would result in serious physical or emotional harm to the child. Brook, 881
S.W.2d at 298; In the Interest of M.W., 959 S.W.2d 661, 665 (Tex.
App.--Tyler 1997, no writ). There must be evidence to support the logical
inference that some specific, identifiable behavior or conduct of the parent
will probably cause that harm. M.W., 959 S.W.2d at 665. This link between
the parent's conduct and harm to the child may not be based on evidence
which merely raises a surmise or speculation of possible harm. Id. When a
non-parent and a parent are both seeking managing conservatorship, "close
calls" go to the parent. Id. at 666; Ray v. Burns, 832 S.W.2d 431, 434 (Tex.
App.--Waco 1992, no writ).

 An adult's future conduct may be somewhat determined by recent past
conduct. M.W., 959 S.W.2d at 666. In and of itself, however, evidence of
past misconduct may not be sufficient to show present unfitness. Id. 
Further, it is wholly inadequate to simply present evidence that a non-parent
would be a better choice as custodian of the child. Lewelling v. Lewelling,
796 S.W.2d 164, 167 (Tex. 1990). The non-parent must offer evidence of
specific acts or omissions of the parent that demonstrate an award of custody
to the parent would result in physical or emotional harm to the child. Id. 
Specific acts or omissions of a parent implicating a significant impairment to
a child's emotional development may be inferred from direct evidence. De
La Pena, 999 S.W.2d at 529. 

 Custody disputes by their very nature are inherently fact-intensive. Id. 
Appellate courts routinely defer to the fact finder at trial concerning matters
of credibility and demeanor, but perhaps in no other type of litigation is it
more critical. Id.

 In this case, during the divorce trial, the trial court heard testimony
from numerous witnesses who presented the trial court with specific,
credible evidence that, if Tammy was given managing conservatorship,
K.C.'s emotional health would be significantly impaired. First, there was
evidence presented to the trial court that Tammy has a history of subjecting
K.C. to repeated investigations for claims of sexual and physical abuse when
there was no evidence of abuse. There was evidence that, if Tammy was
given managing conservatorship, she would continue to make such reports
and significantly impair K.C.'s emotional health. Second, there was
evidence presented to the trial court that Tammy has a history of denying
K.C. any contact with her biological father. There was evidence presented
that, if Tammy was given managing conservatorship, she would continue to
deny K.C. access to her father, which would significantly impair K.C.'s
emotional health. 

 1. Repeated investigations for abuse 

 During the divorce trial, the trial court heard evidence that, after Carol
was given temporary managing custody of K.C., Tammy began making
claims to CPS and law enforcement authorities that K.C. was being
neglected by Carol and was being molested by Douglas. As a result, K.C.
was subjected to repeated investigations by CPS and law enforcement
authorities who found no evidence to support any of Tammy's very specific
and graphic claims of abuse. 

 a. Christina Bailey

 Christina Bailey, a Children's Protective Services ("CPS")
investigator, testified regarding her investigations into Tammy's allegations
of abuse. She testified that, after Carol received custody, CPS received eight
reports of physical abuse and neglect to K.C. by Carol and Douglas. 

 First Report: On November 3, 2002, just two weeks after Carol
received custody of K.C., CPS received an anonymous report of the abuse of
K.C. (4) The caller reported that K.C. had what appeared to be cigarette burns
all over her, had lost a lot of weight and was very pale, had bruises and
bumps all over her body, had some kind of open sores on her head that were
oozing pus, had scratch marks on her face, and had a rash that was covering
her from head to toe. The caller also reported that K.C. spent a lot of time
with Douglas. A CPS caseworker investigated the claims. She met with
Carol, physically observed K.C., and found no evidence of abuse. Despite
Tammy's testimony that the investigations were "inconclusive," Bailey
testified at the divorce trial as follows:

 Q. So did - so was there a finding of any cigarette burns? 

 A. No.

 Q. No finding of weight loss?

 A. No.

 Q. No finding of bruises all over the body?

 A. No.

 Q. No open sores? 

 A. No.

 Q. And no scratch marks to the face?

 A. No. 


CPS determined that K.C. did have some red sores on her body but they
were not the result of abuse or neglect. 

 Second Report: On March 18, 2003, Tammy reported to CPS that
K.C. had been physically neglected by Carol and sexually abused by
Douglas. Tammy reported that K.C. had vaginal irritation that was not
consistent with diaper rash and that this was a sign that she was likely being
sexually abused and that K.C.'s hair smelled like urine and cigarette smoke
and K.C. was not thriving and was underweight. Bailey met with Carol and
K.C. two days after the complaint was made and found no evidence of any
physical or sexual abuse. Despite Tammy's testimony that the investigations
were "inconclusive," Bailey testified as follows:

 Q. Did you see any vaginal irritation?

 A. No.

 Q. Did her hair smell of urine?

 A. No.

 Q. Did she look like she was under weight or emaciated?

 A. No.


Bailey also testified that she did not find any signs of diaper rash or any
redness in K.C.'s diaper area. Bailey saw some areas of K.C.'s skin that had
red blotches and was told by Carol that the doctor had diagnosed them as
eczema. The case was closed. 

 Third Complaint: On May 19, 2003, Tammy filed a complaint
alleging that K.C. had a black eye and that it looked like K.C. had been
punched in the eye. She also reported that K.C. had a vaginal irritation up
inside the vaginal area that was not consistent with diaper rash (that she did
not have any medication or doctor's note for the condition), K.C. had sores
with pus in them all over her body (that she did not have any medication for
those sores), and Carol had a flea infestation in her home. Bailey again met
with Carol and K.C. at Carol's home and found no evidence of any physical
or sexual abuse. Despite Tammy's testimony that the investigations were
"inconclusive," Bailey testified as follows:

 Q. Did you find sores with pus over her body?

 A. No.

 Q. Did you find any flea infestation in the home?

 A. No. 


Bailey spoke with K.C.'s pediatrician, Dr. Steven Alley, about Tammy's
allegations of vaginal irritation and physical abuse and neglect. Dr. Alley
reported that he sees K.C. on a regular basis and has never noticed anything
that concerned him in her vaginal area and that K.C. had gained weight since
she had been with Carol. He also told the caseworker that Carol had brought
K.C. in recently because her eye was swollen from a mosquito bite and that
there was no evidence of bruising to the eye. He reported that K.C. had
sensitive skin and that Carol had been appropriately treating her for this
condition and following his recommendations. Bailey again closed the case
and ruled out Tammy's allegations. 

 Fourth, Fifth, and Sixth Complaints: Bailey testified that Tammy
filed a series of three complaints on May 19, June 14, and July 1, 2003
against Carol and Douglas. These were handled as a single investigation. 
These claims were all similar to previous complaints. First, Tammy alleged
that K.C. was seen at the SAFE House, where her court-ordered visitations
took place, with pus-filled insect bites on her legs, scalp, and all over her
body, some of which were bleeding; scratch marks that appeared to have
been caused by something scraping across her back from shoulder to
shoulder, and underneath the scratch marks there was faint bruising; and
redness in her vaginal area that was not consistent with diaper rash. She also
reported that Douglas had a history of domestic violence and is violent. 

 In investigating these claims, Bailey spoke with Mary Nell Timmons,
a supervisor at SAFE. Timmons told her that she, too, would be concerned
about K.C.'s sores if K.C. were her child. She said that they looked like flea
bites. She also said that the sores on K.C.'s body looked really bad and that
she had noticed redness in K.C.'s diaper area. However, Timmons told
Bailey that she did not think that K.C. was being abused or neglected. She
also told Bailey that she was not aware of K.C having a black eye and that
she did not notice anything wrong with K.C.'s eyes. Timmons said that
K.C. looked healthy, not thin or malnourished. 

 Timmons also informed Bailey that the SAFE staff was concerned
that, when she visited, Tammy was constantly taking pictures of K.C.'s
vaginal area and was obsessed with what was wrong with K.C. Timmons
said that Tammy had to be told to stop taking such pictures of K.C.

 Bailey interviewed Carol and Douglas and observed K.C. regarding
Tammy's complaints. Bailey also had K.C. medically examined for sexual
abuse at the Children's Assessment Center. She testified, in detail,
regarding the 30-minute to one-hour examination that was conducted on
K.C.

 A. Well, I've been in there a few times. They--they kind of
have to pull and twist and turn the child so they can
examine and look into the vaginal area and take pictures
so they sometimes have to move her into awkward
positions.


 Q. Is she clothed or unclothed?


 A. Unclothed.


 Q. Totally unclothed?


 A. Yes. 

 

 Q. And in that posture, then, the person doing the exam has
to move her arms and legs in rigid positions for
photographs?


 A. Yes.


 Q. And after her legs are spread apart, are photographs taken
of her vaginal area?


 A. Yes.


 Q. And in your observations of that, how have the children
reacted?


 A. Usually they're very uncomfortable. Some scream. It's
not a comfortable exam.


 Q. Have - would it be a fair statement to say that you've
observed a tremendous amount of anxiety on children
when they have to undergo that exam?


 A. Yes.


Bailey testified that K.C.'s examination produced no evidence of abuse. 


 Bailey explained to Tammy that, after investigating her claims, CPS
had not found any evidence of abuse. Tammy was upset with the
examination results and believed that they were incorrect. She insisted to
Bailey that the doctors had not looked at K.C. in the right way to see the
redness in her vaginal area. Tammy insisted that Bailey examine K.C.
herself or that CPS take K.C. to another doctor. Bailey testified that it
appeared Tammy wanted K.C. to be continually examined in her vaginal
area until something was found and she was not concerned about the
resulting trauma to K.C. Bailey testified:

 Q. Did she want the child to be continually medically
examined in her vaginal area?


 A. That was my impression.


 Q. Did she show any concern for the trauma that this would
put the child through?


 A. None. 


 On July 1, 2003, Tammy also reported that K.C.'s right leg was
injured and twisted, her right knee was higher than her left knee, K.C. had
difficulty walking, K.C. was crying in pain, and she was covered in
mosquito bites. Bailey testified that, when she went to see K.C. at her day
care, she found her running and walking in no pain, nothing appeared to be
wrong with her legs, and her right knee was not higher than her left knee. 

 Seventh Complaint: On August 11, 2003, Tammy reported that K.C.
had vaginal irritation that was not caused by diaper change or diaper rash
and that she had witnesses to this fact. She also reported that K.C.'s vagina
was bright red internally and externally and that this was observed on
August 9th. She stated that K.C.'s sibling had been abused by Douglas
years ago and the sibling had recently made a sexual outcry to a therapist
and that CPS had ordered Douglas to have no contact with K.C.'s sibling;
K.C. is not able to communicate with people; K.C is showing signs of
frustrated behavior; and K.C. has fluid trapped between her knees because of
an old knee injury, and it is unknown if she has received any treatment. 
After speaking with Rita McKinley, a director at K.C.'s day care, and K.C.'s
guardian ad litem, the case was administratively closed without a physical
examination of K.C.

 Eighth Complaint: Tammy reported on October 4, 2003 that K.C. had
an irritation in her vaginal and rectal areas. Tammy reported that K.C. had
bruises on her calves, she was running a fever of 102 degrees, and her legs
were misaligned because of an injury. Tammy also reported that K.C. had
sores for the past few weeks that appeared to be getting worse, and it was
unknown if Carol had taken K.C. to have them treated. After speaking with
K.C.'s guardian ad litem, a supervisor at SAFE, and a representative of
K.C.'s day care, CPS administratively closed the file on Tammy's complaint
without further investigation.

 Bailey testified that it was CPS's position that K.C. is a healthy child
and that Tammy was notified that CPS's investigations into her reports
found no evidence of physical or sexual abuse. 

 b. Carol Whitworth

During the divorce trial, Carol testified about the effects of Tammy's
claims of abuse on K.C. She stated that, in response to the five complaints
in which CPS came out to her home, she had to present K.C. to be examined
by the CPS case worker, the guardian ad litem, and then Dr. Alley for abuse.
She testified that the process had been physically and emotionally stressful
to K.C. Carol testified that it was horrible for K.C. to go through the
investigations and that she had to comfort her and let her know that she was
being loved and cared for. She testified that K.C. was stressed and not
happy with the process, and Carol testified that she believed that the
investigations exacerbated K.C.'s outbreak of eczema.

 c. Bob Wooten

 Bob Wooten, a captain with the Precinct 3 Constable's office, testified
at the divorce trial that he received three calls from Tammy requesting that
he go to Carol's house and conduct a child welfare check on K.C. After the
first call, he went to Carol's home, but did not find anyone home. He
testified that, after the second call, he went and observed K.C. and found
nothing wrong with her. He testified that, in the third call, Tammy told him
to check on K.C.'s fever. He testified that he went to Carol's home and
found nothing wrong with K.C. (5)

 d. Marietta Walker

 Marietta Walker, the director of the day care that K.C. has attended
almost every day since 2003, testified at the divorce trial that she has never
seen K.C. with oozing sores or sores that were oozing pus or blood, an injury
to her legs that caused her legs to be misaligned or disfigured, or a black eye
that was swollen shut that made her look like she had been punched in the
face. She also testified that, during K.C.'s diaper changes, neither she nor
her staff had seen a vaginal rash that was excessive beyond diaper rash. She
testified that, had she seen any of those things, she would have reported it to
the Texas Protective and Regulatory System.

 e. Dr. Steven Alley

 During the divorce trial, Dr. Steven Alley, K.C.'s pediatrician,
testified that he saw K.C. for the first time several days after Carol was given
temporary custody. Dr. Alley testified that, when he first saw her, K.C. had
a severe eczema skin condition. He testified that the condition could have
been there for longer than several days, and it "was not something that had
come up overnight." He testified that Carol followed his instructions on
caring for K.C.'s eczema. (6) Dr. Alley testified that he saw K.C. in his office
at least a couple of times a month for the past year and that he saw no
evidence of the alleged abuse reported by Tammy. Dr. Alley testified as
follows:

 Q. So, you have seen this child numerous times?


 A. Correct.


 Q. Have you seen any indication of malnutrition in this child?


 A. No.


Q. Have you ever seen an excessive bruising on this child?


 A. No.


Q. Have you ever - and I may not say this right. Have you
ever seen any excessive vaginal rashes on this child?


 A. No.


 Dr. Alley also testified that he did not observe K.C.'s legs to be bent
and twisted, and he did not observe her covered with scars or sores filled
with pus and blood. He testified that he saw K.C. with only the typical
amount of mosquito bites on her extremities for a child her age. He also
testified that he once treated K.C. for vaginitis which cleared up quickly
with the use of antibiotics. 

 f. Tammy Whitworth

 Tammy testified at the divorce trial that she still believes that Douglas
abused K.C. and that CPS did not inform her of the results of its
investigations. Tammy insists that, to her knowledge, the numerous CPS
investigations into her reports were "inconclusive" as to whether abuse
occurred. Tammy testified as follows: 

 Q. Can you tell me how many investigations have been done
since this case has started through CPS?


 A. No, I couldn't tell you, I don't know.


 . . . 


 Q. And there has [sic] been quite a few, though haven't
there?


 A. I believe so, yes.


 Q. And there's not been one positive finding yet, has there?


 A. To my knowledge, they've been inconclusive.


 THE COURT: I'm sorry what?


 A. They have been inconclusive, to my knowledge.


 Tammy testified that she also reported to CPS that Douglas had
molested A.C., K.C.'s half sister. She testified that A.C. was interviewed at
the Children's Assessment Center and the workers there wanted to perform a
gynecological examination of A.C. for evidence of abuse. Tammy told them
that an examination had already been performed and that she would provide
CPS and the Assessment Center with the results. Tammy testified that she
never provided the results to the Assessment Center nor did she provide
those records to Jane Markley, A.C.'s therapist. Tammy testified that the
result of the CPS investigation into her allegations regarding A.C. was
"inconclusive." 

 Tammy violated the trial court's order to stop taking pictures of K.C.
during SAFE visitations and was held in contempt after the court found that,
on three separate occasions, she had violated the court's order regarding
approaching Carol. Tammy admitted that, at the time that she made her
reports to CPS and the constable's office, she was under a court order to
contact the guardian ad litem before making any reports to an investigating
agency and that she disregarded that order.

 g. Dr. Edward Silverman

 Dr. Edward Silverman was appointed by the trial court to examine
Tammy, Douglas, and Carol. Dr. Silverman testified that, even after
learning of Tammy's history of claims to CPS and repeated violations of the
trial court's orders, he still recommended that she be given managing
conservatorship. However, he admitted that learning about Tammy's history
"absolutely" makes him less confident in his recommendation and more
concerned about the issues those facts raise. Dr. Silverman testified as
follows:

 Q. Assume with me, Dr. Silverman, that you had at your
disposal all of the information regarding the CPS
referrals by [Tammy], the validation - the invalidation -
pardon me - of those referrals by CPS, violation of this
Court's order repeatedly in any number of ways, would
that have made any differences at all in your ultimate
recommendation about custody?


 A. Well, I would have to say probably no in the sense that I
have that information now and it would be incumbent
upon me to change my recommendation if I felt that was
warranted. Does it make me less confident in my
recommendation and more concerned about these issues
that those facts raise? Absolutely.


(Emphasis added.) Dr. Silverman testified that, in his opinion, Tammy was
not intentionally fabricating allegations of abuse by Douglas. He stated that,
if he believed that she was intentionally fabricating the allegations, his
recommendation regarding conservatorship would be different. He testified
that Tammy's beliefs of abuse and conduct with respect to Douglas are
reasonable and understandable in light of the "great deal of support and
validation" she received from SAFE representatives and Jane Markley. (7) He
testified that, in his opinion, Tammy's numerous CPS reports were made out
of concern for K.C.

 Based on her personality test results, Dr. Silverman testified that
Tammy has "very significant emotional problems" and is "prone to
hyperbole and exaggeration and this further erodes her credibility and
trustworthiness with others. At times, if the end justifies the means, she may
even be more blatantly deceptive and manipulative." (Emphasis added.) As
Dr. Silverman concluded, "And, again those are the sort of things that make
it difficult - difficult for someone to trust what she says about a lot of
different things." Dr. Silverman's testimony and report of his examination
of Tammy's personality traits provided the trial court with a reasonable basis
to disbelieve Tammy's allegations of abuse and testimony in this case.

 The record contains repeated examples of the type of deceptive and
manipulative behavior described by Dr. Silverman. At the divorce trial
Tammy was evasive regarding her reports of abuse, and she changed her
testimony when she thought that it was in her best interest to do so. For
example, on direct examination regarding her reports to CPS of sores all
over K.C.'s body, Tammy testified that, prior to Carol receiving temporary
managing conservatorship of her, K.C. did not have any skin problems other
than three mosquito bites. When confronted with Dr. Bowman's medical
records indicating that K.C. had a "rash all over body" while in Tammy's
care, Tammy explained that K.C. had an allergic reaction, but she had "never
been diagnosed with a skin condition." After she was accused of playing
word games, Tammy testified, "Well, it's a skin problem, but not diagnosed
as eczema or impetigo like has been suggested." She further acknowledged
that Dr. Bowman's notes were in direct contradiction to her testimony in
court that K.C. had only a few mosquito bites while in her care. (8) She
ultimately admitted that Dr. Bowman's notes reflected a diagnosis of
impetigo and diaper rash, seven days before K.C. was released by the court
into the custody of Carol. 

 Dr. Silverman testified that there were things about Tammy's
personality and the way she has presented herself that would make it
reasonable for the trial court to conclude that she was capable of fabricating
allegations in this case:

 Q. But if it was in her benefit to make these allegations
against Doug, she would persist in those particular items,
wouldn't she? Isn't that her nature?


 A. What allegations are you referring to?


 Q. Say the sexual allegations. If it was to her benefit to
make those allegations, she would persist in those would
she not?


 A. I couldn't answer that with certainty. If you're asking me
whether I think that she's fabricated these allegations
about [K.C.'s older sister], that wasn't my conclusion. 
And if it had been my conclusion then my
recommendation would be very different. 

 

 If you ask me whether there are things about her
personality and the way that she has presented herself
that would make one think that she may be capable of
doing that, I would say that would be a reasonable
conclusion for someone to think that she might be
capable of doing that.


(Emphasis added.)

 When asked to confirm his position regarding the allegations of abuse,
Dr. Silverman testified that he did not think that Douglas was a sexual
predator. Dr. Silverman testified as follows:

 Q. Okay in your recommendation, sir, just with respect to
Doug, you've recommended that he be given visitation
without supervision; is that correct?


 A. That's correct.


 Q. Would you, sir, give him that kind of recommendation if
you, in fact, thought he was a sexual predator?


 A. No. 


 Dr. Silverman's testimony did not give the trial court any reason to
conclude that Tammy would, in fact, change her belief that Douglas was
abusing her children and stop reporting him to authorities. Dr. Silverman
testified from his report that, once Tammy reaches a conclusion about
something important to her, she tends to hold on to this conclusion quite
rigidly even in the face of contradictory information. (9) When responding to a
question about whether there was ever anything really wrong with K.C., Dr.
Silverman also testified that "ultimately, again even if she is the most well-intended mom on earth who is not being deceitful even for a second, if she
continues to always perceive her child as unhealthy, that in and of itself
would be detrimental to [K.C.]." 

 h. Dr. Sharon Hunt

 Finally, the trial court heard evidence from Dr. Sharon Hunt, another
court-appointed psychologist who examined Carol and K.C. She testified
that, if in response to CPS complaints, a child is repeatedly subjected to
interviews for abuse and made to remove her clothes for repeated
examinations for abuse, the child's emotional development would be
significantly impaired. She also testified that, if a parent who has custody
continues to make unsupported claims of abuse by temporary caregivers, a
child's emotional development would be impaired and that this would
interfere with the child's development of a relationship with the temporary
caregivers. 

 The trial court heard voluminous testimony regarding Tammy's
history of subjecting K.C. to repeated investigations for unsubstantiated
claims of abuse and her likelihood to continue doing so, thus significantly
impairing K.C.'s emotional health. It also heard testimony that Tammy had
a history of denying K.C. any contact with her biological father and her
likelihood to continue doing so, thus significantly impairing K.C.'s
emotional health. 

 2. History of denying K.C. contact with her biological father

 During the divorce trial, the trial court heard evidence that, while she
had custody of K.C., Tammy repeatedly violated the trial court's visitation
orders, denying K.C. access to her father. The trial court heard testimony,
disputed by Tammy, that, over the course of one year, Tammy did not allow
Douglas access in 82 out of 85 court-ordered visitations. The record reflects
that, after "multiple warnings," the trial court sentenced her to 10 days in jail
for "continuous parental alienation against father through repeated
visitation/access denials and behavior in court." Based on her behavior to
the trial court, the court also deemed Tammy a flight risk with K.C. The
trial court heard testimony that, as a result of Tammy's conduct, K.C. was
prevented from bonding with her father. 

 Despite this conduct, Tammy testified that it was in K.C.'s best
interest to have a good relationship with Douglas and Carol. She testified
that, if she were awarded managing conservatorship, she would not "take
off" with K.C. and hide her at a relative's house. She testified that, although
she had violated a number of the trial court's orders, once the trial was over,
she would follow the court's orders. 

 Tammy testified regarding her history of noncompliance with the trial
court's orders. Tammy admitted that she was held in contempt for violating
the court orders concerning K.C.'s visitation with Douglas, presenting K.C.
for court hearings, and for her demeanor in the courtroom. Tammy testified
that the trial court found her in contempt because she did not have legal
representation to present her side of the case. 

 Dr. Silverman testified that he believed that Tammy would comply
with future court orders concerning visitation with Douglas. However, when
confronted with evidence of Tammy's significant history of noncompliance
and his own prior testimony that the past conduct typically is a strong
predictor of future behavior, he considerably qualified his testimony on this
issue. Dr. Silverman testified as follows: 

 Q. Okay. Would you agree with me that there is a
significant history of noncompliance with the Court's
orders?


 A. Yes.


 Q. And is the past not typically a strong predictor of future
behavior?


 A. Often it is, yes.


 Q. Why in the world, then, would we believe that during the
pendency of a lawsuit [Tammy] would violate a court
order over and over and over again when the custody of
her child was hanging in the balance, and yet, it's your
belief if I understand you correctly, that if given custody
of this child, she's going to follow this Court's order
once she has custody of [K.C.]?


 A. I mean, I think there's good reason to be skeptical of it. 
It's not like I'm saying I believe very strongly and I have
the utmost confidence in that. I'm coming down on that
side of the fence, but, however, so slightly. Some of
those violations occurred prior to [K.C.] being taken
away -


 Q. Yes, they did.


 A. - and I think that that - sort of her perception of what
could happen to her was probably a lot different then
than afterwards. As far as a lot of the violations that
you've talked about, I haven't had any opportunity to talk
to her about what her thinking was and what - how she
would explain her awareness of whether she felt that
would jeopardize her ability to have [K.C.] or not.


 I mean, there's no question that - that - that those
violations were - were, in my opinion, self-destructive. 
And there's also no question that I think any reasonable
person would have to wonder whether she's going to be
able to conform to the requirements of the Court in the
future.


(Emphasis added.) Finally, when asked about the impact to a child from
being deprived of her father, Dr. Silverman responded that, "And again, not
having a relationship with one's father, I think, significantly impairs one's
emotional development." 

 Based on our review of the evidence, we conclude that the trial court
did not abuse its discretion in appointing Carol as the sole managing
conservator after finding, by a preponderance of credible evidence, that
appointing Tammy as a managing conservator would result in serious
physical or emotional harm to K.C. See Brook, 881 S.W.2d at 298. We also
hold that the trial court did not abuse its discretion in awarding Tammy less
than standard possession. (10) 

 We overrule Tammy's first and second issues. 


Conclusion


 We affirm the judgment of the trial court. All outstanding motions are
denied as moot. 


 George C. Hanks, Jr.

 Justice



Panel consists of Justices Nuchia, Keyes, and Hanks.


Justice Keyes, dissenting.






 
1. Tammy has two other children, A.C. and J.C., who are from different fathers.
2. We asked the parties to file supplemental briefs addressing standing. 
3. The dissent apparently argues that, under the holding in Troxel v. Granville,
530 U.S. 57, 120 S. Ct. 2054 (2000), it would be unconstitutional for the trial
court to allow Carol to intervene under section 102.004(b). Troxel involved
the constitutionality of a grandparent visitation statute that allowed any person
to petition the court for visitation rights at any time and allowed the court to
grant such rights based on the best interest of the child. Id. at 60, 120 S. Ct.
at 2057. The Supreme Court held that the statute was unconstitutional because
it infringed on a parent's fundamental right to make decisions concerning the
care, custody, and control of her children. Id. at 72, 120 S. Ct. at 2063. Troxel
does not, however, affect the issue of establishing standing to intervene in an
ongoing suit affecting the parent-child relationship presented by the case
before us. In this case, section 102.004(b) does not interfere with a parent's
right to make decisions concerning her children. As shown below, before
Carol could be awarded managing conservatorship, she was still required to
overcome the strong parental presumption in favor of Tammy in a trial on the
merits. See, e.g., In re SSJ-J, 153 S.W.3d 132, 138 (Tex. App.--San Antonio
2004, no pet.) (holding that Troxel opinion did not affect issue of grandparent
standing because Texas Family Code standing statute does not overrule
parental presumption). As courts have repeatedly held, standing to intervene
means only the right to be heard, not the right to win. Id.
4. Although Tammy admits that she made similar reports of abuse to CPS, she
denied making a report on this date. The trial court disagreed and made a
contrary finding. 
5. Tammy also testified that another officer, Constable Edmundson, did a welfare
check on K.C. and found nothing wrong with her as well.
6. Carol testified that K.C. had eczema when Carol was first given temporary
custody.
7. Dr. Silverman spoke to Markley and Jamie Frank, the director of SAFE, by
telephone and included a summary of his conversation with them in his report. 
Neither Markley nor anyone from SAFE testified at trial nor were their records
regarding K.C. submitted to the trial court for review.
8. In addition to playing these "word games," Tammy was evasive when she was
questioned about whether she influenced K.C.'s half-sister into making an
"outcry" of abuse against Douglas by repeatedly discussing her alleged abuse
in front of her. 
9. As an example of this behavior, Dr. Silverman testified that Tammy believes
Douglas to be the biological father of A.C., despite a DNA test that states that
he is not the father. Tammy stated to Dr. Silverman that it was her belief that
the DNA test was inaccurate because milk products can cause bacteria that
invalidate the results of a DNA test. 
10. Tammy also argues that the trial court's action violated her rights to due
process under the United States Constitution. However, Tammy did not assert
any constitutional claim before the trial court and she has not preserved this
issue for appeal. See Tex. R. App. P. 33.1.