

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-19-00073-CV
_____

IN THE INTEREST OF T.E.R., A CHILD

On Appeal from the 307th District Court
Gregg County, Texas
Trial Court No. 2018-1019-DR

Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Justice Burgess

# OPINION

Appellant Lisa Sullivan (Lisa) appeals from an order denying her motion to dismiss for lack of standing and an order granting Appellee Mandy Robert's (Mandy's) petition for adoption. Because we find that sufficient evidence supports the trial court's conclusion (1) that Mandy had standing to pursue the adoption and (2) that the adoption was in the child's best interest, we affirm the judgment of the trial court.

## I. Background

Lisa and Mandy, both residents of Texas, began dating in December 2008. In August 2009, Lisa legally changed her surname to Mandy's surname. On November 21, 2009, Lisa and Mandy travelled to Kent Falls, Connecticut, to get married. After the wedding, Lisa and Mandy returned to Texas to live as a married couple.

Following their marriage, Lisa and Mandy decided that they wanted to adopt a child. Several years later, Lisa filed a petition to adopt T.E.R,[1] an infant child, and the trial court granted her petition on January 22, 2014. When T.E.R. was three and one-half years old, Mandy filed for divorce. In their agreed final divorce decree, the trial court found that Lisa was T.E.R.'s parent pursuant to the January 22, 2014, order granting the adoption. The court also gave Mandy and Lisa joint managing conservatorship of T.E.R., with Lisa having the exclusive right to designate T.E.R.'s primary residence within the State of Texas. The decree also stated, under the heading "Mutual Releases," that the "release [did] not include any future claims of adoption."

---

[1]In order to protect the minor child's privacy, we refer to the child by initials and have changed the names of the parents. *See* TEX. FAM. CODE ANN. § 109.002(d).

2

On May 29, 2018, Mandy filed an original petition for adoption of child, seeking to adopt T.E.R. On June 25, 2018, Lisa filed a motion to dismiss Mandy's petition for adoption for lack of standing. On February 6, 2019, Mandy filed an amended petition for adoption and a general denial to Lisa's motion to dismiss. On February 22, 2019, Lisa filed a motion for judgment as a matter of law, arguing that the substantive law did not permit Mandy to adopt T.E.R. On March 18, 2019, after finding that Mandy had produced sufficient evidence to prove she had standing to file her petition, the trial court entered an order denying Lisa's motion to dismiss for lack of standing and denying her motion for judgment as a matter of law. On May 10, 2019, the trial court found that Mandy's adoption of T.E.R. was in T.E.R.'s best interest and entered an order granting adoption. The trial court entered its findings of fact and conclusions of law on June 26, 2019.

## II. The Trial Court Did Not Err When It Found that Mandy had Standing to Proceed with the Adoption of T.E.R. Pursuant to Section 102.005(5) of the Texas Family Code

In her first point of error, Lisa contends that the trial court erred when it found that Mandy had standing to pursue the adoption of T.E.R. We disagree.

### 1. Standard of Review Applicable to Standing Issues Resolved at Trial

In the present case, the trial court found that Mandy had standing pursuant to Section 102.005(5) of the Texas Family Code, which provides,

> An original suit requesting only an adoption or for termination of the parent-child relationship joined with a petition for adoption may be filed by . . . (5) another adult whom the court determines to have had substantial past contact with the child sufficient to warrant standing to do so.

TEX. FAM. CODE ANN. § 102.005(5). Typically, "a party's standing to seek relief is a question of law we review *de novo*." *In re S.M.D.*, 329 S.W.3d 8, 12–13 (Tex. App.—San Antonio 2010, pet.

3

dism'd). This is particularly so in instances where standing is conferred by statute because resolution of the issue turns on statutory construction. *In re S.A.M.*, 321 S.W.3d 785, 788 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (noting that, "[i]n statutory standing cases, . . . the analysis is a straight statutory construction of the relevant statute to determine upon whom the Texas Legislature conferred standing and whether the claimant in question falls within that category").

Nevertheless, some statutes "provide[] a list of person[s] who automatically have standing to bring an original suit," whereas others list individuals who have standing upon proving additional statutory requirements by a preponderance of the evidence. *Von Behren v. Von Behren*, 800 S.W.2d 919, 920 (Tex. App.—San Antonio, 1990, pet. dism'd) (citing *Tex. Family Code & Commentary*, 17 TEX. TECH. L. REV. 1045, 1072 (1986) (Commentary by John J. Sampson) (discussing Section 11.03(b)—now Section 102.004(b)—of the Texas Family Code)).[2] Section 102.005(5) grants standing to persons who can prove the additional statutory requirement of "substantial past contact" with the child by a preponderance of the evidence. *S.M.D.*, 329 S.W.3d at 13. What constitutes "substantial past contact" is not defined by statute or caselaw, *C.M.C.*, 192 S.W.3d at 871,[3] and the inquiry into whether a party has had "substantial past contact" with a child

---

[2]In *Von Behren*, the petitioner sought standing to obtain managing conservatorship of her grandchildren under former Section 11.03(b) (now Section 102.004(b)) of the Texas Family Code. *Von Behren*, 800 S.W.2d at 921. The San Antonio Court of Appeals noted that under that statute, the "grandparent does not have standing automatically by virtue of the relationship that exists with the child, but must show 'satisfactory proof' that the child's environment with the parent or parents presents a serious and immediate question concerning the welfare of the child." *Id.*

[3]In *C.M.C.*, we noted, "What constitutes 'substantial past contact' is not statutorily defined, and our search of the caselaw has not revealed any caselaw definition." *C.M.C.*, 192 S.W.3d at 871. Yet, we also noted that "'[s]ubstantial' is defined as 'of ample or considerable amount, quantity, size, etc.'" *Id.* at 872 (citing RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1897 (unabridged 2d ed. 1987)).

is fact-intensive and should focus on the amount of actual contact. *Id.*; *see also Chavez v. Chavez*, 148 S.W.3d 449, 456 (Tex. App.—El Paso 2004, no pet.) (grandparents had standing to intervene when children lived with them for over a year); *In re A.M.*, 60 S.W.3d 166, 168 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (foster parents had standing when seventeen-month-old child resided with them for fourteen months); *In re M.T.*, 21 S.W.3d 925, 926 (Tex. App.—Beaumont 2000, no pet.) (foster parents had standing to intervene after children lived with them for fourteen months); *In re Hildago*, 938 S.W.2d 492, 495–96 (Tex. App.—Texarkana 1996, no writ) (stepmother had standing to file petition for managing conservatorship when she and child were close since child's birth and child resided with her). Accordingly, although standing is typically a pure question of law, whether a party has standing to adopt under Section 102.005(5) is a mixed question of law and fact.[4]

In cases involving mixed questions of law and fact, we apply a hybrid standard that incorporates elements of both factual and legal standards of review. *Delfingen U.S.-Tex., L.P. v. Valenzuela*, 407 S.W.3d 791, 799 (Tex. App.—El Paso 2013, no pet.); *see also*, *Iliff v. Iliff*, 339 S.W.3d 126, 133–34 (Tex. App.—Austin 2009), *aff'd*, 339 S.W.3d 74 (Tex. 2011) (holding that

---

[4]In *In re N.L.W.*, we noted,

> Black's Law Dictionary further defines a "mixed question of law and fact" as "[a]n issue that is neither a pure question of fact nor a pure question of law." While this merely states the obvious, the definition refers to a corollary definition of "intermediate fact," which is defined as "[a] fact that helps lead to an ultimate fact or is a necessary element to a chain of reasoning leading to a conclusion."

*In re N.L.W.*, 534 S.W.3d 102, 109–10 (Tex. App.—Texarkana 2017, no pet.) (citing Mixed Question of Law and Fact and Intermediate Fact, BLACK'S LAW DICTIONARY (10th ed. 2014)). Because standing to adopt under Section 102.005(5) requires a court to resolve "[a] fact—substantial past contact—that . . . is a necessary element to a chain of reasoning leading to a conclusion," it is a mixed question of law and fact. *Id.*; *see also Mega Child Care, Inc. v. Tex. Dep't of Protective & Regulatory Servs.*, 29 S.W.3d 303, 309 (Tex. App.—Houston [14th Dist.] 2000) (noting that "[a]n issue involves a mixed question of law and fact when a standard or measure has been fixed by law and the question is whether the person or conduct measures up to that standard").

in considering "issues of child support, division of the marital estate, and child custody, possession, and visitation," appellate courts "employ a hybrid analysis").[5] Under this standard,

> [T]he appellate court defers to the trial court's factual determinations supported by the record and reviews legal conclusions de novo. The reviewing court does not engage in its own factual review, but decides whether the record supports the trial court's resolution of factual matters. If the record supports the trial court's resolution of factual matters, the reviewing court is not at liberty to disturb them. A reviewing court instead determines whether the trial court properly applied the law to the facts in reaching its legal conclusion. It does not defer to the trial court on questions of law.

*Valenzuela*, 407 S.W.3d at 799 (citations omitted); *see Iliff*, 339 S.W.3d at 134 (holding that appellate courts "engage in a two-pronged inquiry asking first, whether the trial court had sufficient information upon which to exercise its discretion, and second, whether the trial court erred in its application of discretion").

### 2.   Summary

Consequently, because the issue of whether a person has standing under Section 102.005(5) of the Family Code is a mixed question of fact and law, we review the trial court's ruling in this

---

[5]Somewhat confusingly, Texas courts have referred to the two-pronged standard of review applicable to mixed questions of law and fact as an abuse-of-discretion standard. *See State v. $217,590.00 in U.S. Currency*, 18 S.W.3d 632, 633 (Tex. 2000) (holding that "we review a trial court's decision on a mixed question of law and fact for an abuse of discretion") (citing *Brainard v. Tex.*, 12 S.W.3d 6, 30 (Tex. 1999)); *see also Von Behren*, 800 S.W.2d at 921, 923 (holding that because Section 11.03(b) of the Family Code (now Section 102.004(b)) requires a "grandparent to show 'satisfactory proof' that the child's environment with the parent or parents presents a serious and immediate question concerning the welfare of the child" to have standing, "appellate review centers upon a determination of whether the trial court abused its discretion in reaching its decision"). The confusion arises because in other contexts the term "abuse of discretion" has been defined as what happens when a trial court "acts without reference to guiding rules or principles." *C.f., In re Nat'l Lloyds Ins. Co.*, 507 S.W.3d 219, 226 (Tex. 2016) (mandamus case involving a discovery sanction); *Lewis v. United Parcel Serv., Inc.*, 175 S.W.3d 811, 815 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (denial of a mistrial); *In re Waggoner Estate*, 163 S.W.3d 161, 165 (Tex. App.—Amarillo 2005, no pet.) (order appointing a receiver). And, in criminal cases, a trial court abuses its discretion when its decision falls outside the "zone of reasonable disagreement." *Buntion v. State*, 482 S.W.3d 58, 72 (Tex. Crim. App. 2016). Rather than attempt to harmonize these various formulations of the abuse-of-discretion standard of review—and to avoid confusion in this opinion—we will simply refer to the standard applicable to this case as a hybrid standard.

case under the hybrid standard. Under that standard, we first evaluate whether there is any supporting evidence in the record that the petitioner had past contact with the child. If there is no evidence that the petitioner had any past contact with the child, then we will find that the petitioner has failed to establish standing to sue under Section 102.005(5) as a matter of law. If the evidence is undisputed about the nature and degree of the petitioner's past contact, then we determine whether that evidence constitutes "substantial past contact" as a matter of law. Under either of the above scenarios, we give no deference to the trial court's legal conclusion and decide the question de novo.

However, if there is a dispute about the nature and degree of the petitioner's past contact with the child, then the trial court must consider the evidence and resolve that fact question. On appeal, we will "not engage in [our] own factual review, but [will] decide[] whether the record supports the trial court's resolution of factual matters." *Valenzuela*, 407 S.W.3d at 799–800. If we determine that there is support for the trial court's findings of fact, then we will decide whether those facts rise to the level of "substantial past contact" as a matter of law. In deciding that legal issue, we give no deference to the trial court's legal conclusion but decide the question de novo.[6]

---

[6]Essentially, under the hybrid standard of review in this case, we are presented with two questions. First, what contact did Mandy have with T.E.R.? Second, does that contact constitute "substantial past contact" under Section 102.005(5)? The first question is a fact question. The trial court answered that question by issuing findings of fact specifying what contact Misty had with T.E.R. *See infra* note 7. On appeal of that question, we ask whether the evidence is legally and factually sufficient to support that finding. The second question is a question of law. The trial court answered that question by issuing conclusions of law; specifically, the trial court concluded that "[Mandy] is an adult who has had, and continues to have, substantial past contact with T.E.R." On appeal, we review this second question de novo. If we find that the evidence is legally and factually sufficient to support the trial court's answer to the first question, and if we find on de novo review that the contact found by the trial court constitutes "substantial past contact" under Section 102.005(5), then we must affirm the trial court's ruling that Mandy had standing under Section 102.005(5).

4. **Evaluation of Legal and Factual Sufficiency Under the Abuse-of-Discretion Standard of Review**

In this case, the trial court heard the evidence and made findings of fact regarding the nature and degree of Mandy's past contact with T.E.R.[7] Lisa did not challenge those findings in the trial

---

[7]The trial court entered the following findings of fact:

1. In or about December 2008, Petitioner, [Mandy] and Respondent, Lisa Sullivan (Lisa) began a dating relationship.
2. In November 2009, the parties married in the State of Connecticut, and after the wedding they returned to Texas to live together as a married couple.
3. In 2013, [Mandy] became aware of an expectant mother interested in placing her unborn child, now known as T.E.R., up for adoption. [Mandy] made the initial contact with the couple and maintained contact with the mother and father throughout the pregnancy. Both Lisa and [Mandy] attended prenatal appointments and at least one sonogram. The two, along with [Mandy]'s parents, also provided emotional and financial support to the birth parents. Lisa and [Mandy] publicly announced they were having a baby. They held a baby shower together. They also had a "baby" reveal to [Mandy]'s mother by presenting her a "onesie." Lisa advised [Mandy]'s mother she would be a grandparent.
4. T.E.R. was born on March 25, 2013. In addition to Lisa and [Mandy] being present, [Mandy]'s parents and sister were present at the birth, as well as Lisa's daughter. Lisa and [Mandy] brought the child home from the hospital and began living as a family unit. They added a nursery to the home and had it decorated appropriately. They placed the baby's crib in the room they shared. They sent out birth announcements.
5. It is undisputed in this case, that T.E.R. was born to his biological mother B.H. on March 25, 2013. Upon the child's birth, B.H. became the mother to the child. That parent-child relationship was terminated by an order of termination signed and filed with this Court on January 22, 2014, in Cause No. 2013-2152-DR.
6. In January 2014[,] Lisa adopted the child, T.E.R., in Gregg County, Texas. The child's name was changed, and he was given [Mandy]'s surname of "Ryan."
7. It is undisputed that Lisa, [Mandy] and T.E.R. lived together as a family unit for more than three years, when in or about May 2016, [Mandy] filed a petition for divorce. During the three year period preceding the divorce, [Mandy] participated in the normal activities of a parent to T.E.R., including feeding him, dressing him, playing with him, bathing him, caring for him when he was sick, taking and picking him up from school, diaper changes, laying him down for naps and the like. [Mandy] went to wellness checks, gave the child needed medications and participated in late night feedings. Lisa stated that for all intents and purposes, [Mandy] has raised T.E.R. T.E.R. refers to [Mandy] as "Maz" or "Mazzy" (sp.), which, in [Mandy]'s family, is a term used to refer to "mother".[sic] T.E.R. attended Oak Forest Montessori School, where [Mandy] was a member of the parent teacher organization and attended functions for the child.
8. On March 28, 2017, the Rusk County Court at Law signed the Agreed Final Decree of Divorce . . . in Cause No. 2016-08-380.
9. The Agreed Final Decree of Divorce states: "The Court finds that the pleadings of the Petitioner are in due form and contain all the allegations, information and prerequisites

8

court. Nevertheless, she argues on appeal that "[t]here is insufficient evidence in the record that Mandy Roberts has had substantial past contact with the adoptive child beyond scheduled access and visitation."[8] Rule 33.1(d) of the Rules of Appellate Procedure provides:

> ***Sufficiency of evidence complaints in civil nonjury cases.*** In a civil nonjury case, a complaint regarding the legal or factual insufficiency of the evidence— . . . as distinguished from a complaint that the trial court erred in refusing to amend a fact finding or to make an additional finding of fact—may be made for the first time on appeal in the complaining party's brief.

---

required by law. The Court receiving the evidence, finds that it has jurisdiction of this case and all parties and that at least sixty days have elapsed since the date the suit was filed."

10. In the Agreed Final Decree of Divorce, the parties were named joint managing conservators of T.E.R., and [Mandy] was granted a possession order along with significant rights and duties.

11. [Mandy] has regularly and consistently exercised her court ordered periods of possession.

12. At the time the Original Petition for Adoption of a Child was filed by [Mandy] on May 29, 2018[,] and the Amended Petition for Adoption filed by [Mandy] on February 6, 2019, [Mandy] was a resident of Gregg County, Texas; T.E.R. was at least two years old; the parent-child relationship as to B.H., the child's birth mother, had been terminated; [Mandy] is T.E.R.'s former stepparent; and has been a managing conservator of T.E.R. for a period of one year preceding the adoption. The requirement that T.E.R. resided with [Mandy] for not less than six months prior to the granting of the adoption was waived and such waiver is in the best interests of the child. [Mandy] has had actual care, possession and control of T.E.R. for a period of one year preceding the adoption.

13. [Mandy] is a managing conservator of T.E.R. and expressly consented to the adoption.

14. On August 8, 2018, [Mandy] filed her Notice of Filing of Criminal History Report of Petitioner and a Combined Pre-Adoptive Home Screening and Post-Placement Adoptive Report. On August 13, 2018, [Mandy] filed a Notice of Filing of Affidavit Concerning Interstate Compact.

15. On March 26, 2019, the Court entered an Order Appointing Evaluator to Perform Adoption Evaluation. On April 17, 2019, the Social Study Report of Investigator in Adoption Case was filed as ordered by the Court.

16. All the prerequisites and requirements of adoption by [Mandy] with regard to T.E.R. were met.

17. Even though Lisa filed a motion to dismiss and a motion for judgment as a matter of law, she did not challenge [Mandy]'s claim of standing pursuant to Texas Family Code § 102.005(5).

18. The adoption of T.E.R. by [Mandy] is in the best interest of the child.

[8]Although Lisa does not specify whether she is complaining of legal insufficiency, factual insufficiency, or both, and although she does not cite us to the applicable standard of review, we construe her point of appeal as raising both legal and factual insufficiency. *See Storck v. Tres Lagos Prop. Owners Ass'n, Inc.*, 442 S.W.3d 730, 735 (Tex. App.— Texarkana 2014, pet. denied).

9

TEX. R. APP. P. 33.1(d). Therefore, Lisa can challenge the legal and factual sufficiency of the evidence to support the trial court's findings of fact.

Accordingly, we will first consider whether the evidence relied upon by the trial court is legally and factually sufficient to support its findings. If we find that the evidence is legally and factually sufficient to support the trial court's findings of fact, we will then determine whether the evidence found by the trial court rises to the level of "substantial past contact" for purposes of Section 102.005(5) as a matter of law.

**B.    Analysis**

**1.    Was the Evidence Legally Sufficient to Support the Trial Court's Findings of Fact?**

**a.    Standard of Review**

As the court of appeals in *Iliff* noted,

> We will sustain a legal sufficiency challenge when (1) the record discloses a complete absence of a vital fact; (2) the court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. In determining whether there is legally sufficient evidence to support the finding under review, we examine the record for evidence and inferences that support the challenged finding, considering the evidence favorable to the finding if a reasonable factfinder could, and disregarding evidence contrary to the finding unless a reasonable factfinder could not.

*Iliff*, 339 S.W.3d at 134 (citing *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998)). Based on our review of the record, we find that the evidence is legally sufficient to support the trial court's findings of fact.

10

###### b. Analysis

At the hearing on her petition to adopt T.E.R., Mandy testified that she met T.E.R.'s biological mother and his putative father while the mother was pregnant with T.E.R. After meeting the biological parents, Mandy was informed that the couple intended to place their child up for adoption and that they would be agreeable to Mandy and Lisa adopting the child. Mandy then made the announcement to family and friends that she and Lisa were adopting a baby. Mandy and Lisa eventually had a baby shower at their home to celebrate T.E.R.'s upcoming arrival. The couple also surprised Mandy's mother by giving her a wrapped gift containing baby clothes. Lisa told Mandy's mother "[t]hat she was going to be a grandmother." Mandy explained that she and Lisa decided to give T.E.R. Mandy's stepfather's middle name. When asked if Lisa ever referred to Mandy as just a friend during the time they were preparing for the baby's arrival, Mandy answered, "[N]o."

According to Mandy, she and Lisa stayed in contact with the biological parents during the pregnancy. Lisa and Mandy attended the biological mother's doctors' appointments, including her sonogram appointments.[9] They were both present when the sonogram revealed the baby's gender. In addition to their presence at doctors' appointments, Mandy and Lisa also offered the biological parents emotional support and financial support throughout the pregnancy.

T.E.R. was born in March 2013, and Mandy and Lisa were present at the hospital on the day of his birth. Mandy's mother, father, and sister were also there. Several photographs were

---

[9]Mandy described an incident when the results of a sonogram indicated that the baby might have Down's Syndrome. That same day, Lisa and Mandy decided that they still wanted to adopt the child. Mandy said that it did not matter if the child "could be missing [a] leg, missing limbs, whatever the case may be, you know, Down's Syndrome, we still wanted to adopt the child, no matter what the problem was." Despite the sonogram results, the child was born healthy.

taken after T.E.R. was born, and a certificate was created that said, in part, "This is to certify that [T.E.R.], child of Lisa and Mandy Ryan, was born on March . . . 2013." Mandy said that they had the certificate framed and displayed it on the wall in their home. According to Mandy, she and Lisa also designed a birth announcement to send to their family and friends. The announcement contained T.E.R.'s date of birth, weight, and length and concluded, "With love, Lisa and Mandy."

Mandy testified that she and Lisa stayed with T.E.R. while he was in the hospital. Mandy said that as far as she could recall, the biological mother only saw him twice and that she and Lisa had him the remainder of the time. While T.E.R. was in the hospital, Mandy and Lisa took care of him and when, he was released, they both took him home. They also decided that Lisa would take maternity leave to be with T.E.R., and she stayed home with him for six weeks. When asked why they decided that Lisa should stay home with T.E.R., Mandy explained, "Since she was the one doing the adoption legally, and by policy of my work I was not able to take off that amount of time."

In 2013, Lisa filed a petition for adoption of T.E.R. In January 2014, the trial court terminated the parental rights of T.E.R.'s biological parents and found that it was in T.E.R.'s best interest for Lisa to adopt him. Among other things, the trial court ordered that T.E.R. would retain Mandy's surname.

When Mandy was asked why the couple had decided that Lisa should be the party to legally adopt T.E.R., she responded that they had been discussing the financial aspect of adopting T.E.R. and that "Lisa had a legal plan, like Legal Aid or whatever the program was called." She continued, "Instead of asking my parents for five grand or whatever else monetary amount, we chose to go

with Lisa's legal plan that ended up $750 for an adoption." In addition to Lisa, Mandy's mother and father were present in the courtroom the day T.E.R. was adopted. Mandy explained that she was not present because she was required to work that day.

Mandy also said that while T.E.R. was an infant, she interacted with him, doing things such as late-night feedings and changing his diapers. She also attended his doctors' appointments and administered his medications when it was necessary. She was present at his birthday parties and all holidays. Mandy explained that she was there when T.E.R. learned to walk and talk and that she had helped him achieve those milestones.

At the time of the hearing, T.E.R. was five years old, and according to Mandy, he was a very active little boy. Many photographs of T.E.R. were admitted into evidence, as were several photographs of Mandy and T.E.R. A variety of T.E.R.'s crayon drawings were also admitted into evidence. Mandy explained that they were "some drawings that we were doing, some coloring while we were out eating one night."

According to Mandy, her mother and father were involved in T.E.R.'s life, and T.E.R. referred to them as Nana and Pawpaw. Mandy explained that her mother had spent a significant amount of time with T.E.R., caring for him five days a week while Mandy and Lisa were at work. Mandy's sister was also involved in T.E.R.'s life, and he referred to her as Aunt G.

When T.E.R. was eighteen months old, he began attending the Montessori school. Mandy said that she took T.E.R. to school and picked him up from school. During that time, Lisa neither placed any restrictions on Mandy nor gave Mandy any directions in regard to her responsibilities. According to Mandy, she was very involved in T.E.R.'s education. Mandy said that her mother

paid for half of T.E.R.'s school tuition and that she paid the other half. In addition to tuition, Mandy paid for T.E.R.'s lunches and school supplies. She attended all of T.E.R.'s soccer practices, and "his Nana would take him from there so [Mandy] [c]ould finish working." Mandy also testified that

> [o]ne time [Lisa] got really upset after soccer practice at a teacher. [Lisa] was quite upset that they didn't know pretty much who she was because she wasn't present. So, you know, she got really aggravated. Whenever somebody doesn't see you on a daily basis or . . . know you are involved . . . they're not supposed to know who you are. So, she wasn't happy with that.

According to Mandy, she could not recall a time when Lisa considered Mandy to be anything other than T.E.R.'s mother. Likewise, Mandy said that she had never considered herself anything but his parent. She also said that Lisa never discouraged T.E.R. from referring to Mandy's parents as "Nana" and "Pawpaw."

Mandy testified that it had always been her intent to adopt T.E.R. She said she had exercised all of her visitation rights with T.E.R. and that she had always been a constant figure in his life. When T.E.R. got older, Mandy enrolled him in St. Mary's school. She signed a contract with the school so that she could pay his tuition, which she did. Mandy said that she did not receive any "backlash" from Lisa for enrolling him in St. Mary's or for signing the contract with the school.[10]

---

[10]Mandy also testified that after the couple divorced, she attempted to abide by the terms of the divorce decree. But, according to Mandy, Lisa prevented her from doing such things as attending T.E.R.'s doctors' appointments. Even so, Mandy would sit in the waiting room while T.E.R. was being examined. She also said that since the divorce, Lisa prevented her from being involved with T.E.R.'s education, despite the fact that she had told Lisa she wanted to be involved in his school activities. According to Mandy, Lisa refused to allow Mandy to talk to T.E.R. on the telephone. She explained, "I would normally text Lisa seeing if I could talk to him or have any communication, and that was always a no."

14

When we consider only the evidence that supported the trial court's findings—and disregard all contrary evidence and inferences unless the trial court could not have done so—we conclude that there was legally sufficient evidence to support the trial court's findings of fact.

### 2. Was the Evidence Factually Sufficient to Support the Trial Court's Findings of Fact?

#### a. Standard of Review

When we perform a factual sufficiency analysis, "we weigh and consider all of the evidence in the record," and "[w]e will sustain a factual sufficiency challenge and 'set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.'" *Iliff*, 339 S.W.3d at 134–35. Thus, in addition to the evidence previously cited, in performing a factual sufficiency review, we also consider the evidence contradicting the trial court's findings of fact and determine whether the trial court's findings are "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Id*. at 135.

#### b. Analysis

Much of Lisa's testimony at the divorce hearing substantiated Mandy's description of her involvement in T.E.R.'s life and supported the trial court's findings.[11] Yet, some of her testimony during the adoption proceeding contradicted Mandy's testimony that Mandy had been substantially

---

[11]During the divorce proceedings, Lisa agreed that it had been Mandy who initially had contact with T.E.R.'s biological parents. She conceded that both she and Mandy took T.E.R. home from the hospital following his birth, that he had lived with Mandy and Lisa in the same household since the day he was born, and that the couple raised him like he was their child. When Lisa was asked if Mandy changed T.E.R.'s diapers, fed him, clothed him, played with him, bathed him, transported him to and from school, took him to the doctor, and had taken care of T.E.R, Lisa answered that Mandy had done all of those things. Lisa also conceded that Mandy took care of T.E.R. during the times that Lisa was outside of the home, either working or on vacation. Lisa agreed that "[f]or all intents and purposes, [Mandy] had raised [T.E.R.]." According to Lisa, Mandy was a "great mother to [T.E.R.]," and Mandy had not harmed him. When Lisa was asked who provided the greater amount of caretaking for T.E.R., Lisa answered, "Right now it's pretty even."

15

involved in T.E.R.'s life. For instance, Lisa could not recall ever saying that she and Mandy were going to adopt a baby. She also said that Mandy contacted the birth parents regarding the possibility of adopting T.E.R. because Lisa "hounded her." In addition, Lisa stated that Mandy had contacted the birth parents on Lisa's behalf so that Lisa could adopt T.E.R. on her own. Lisa also said that the birth parents were aware that she would be the only person adopting T.E.R. She stated that the only reason she allowed Mandy to be involved in the preparation of T.E.R.'s birth announcements was "[b]ecause [they] still lived together, even though [they] were not intimate." Lisa pointed out that Mandy's name was not on T.E.R.'s birth certificate. According to Lisa, "[She] told Mandy that [she] would never do a joint adoption, because [she] had already fought for custody for [her] children."

Contrary to the testimony she gave during the divorce proceedings, Lisa testified, during the adoption proceedings, that, when T.E.R. was an infant, "[Mandy] didn't get up with him in the middle of the night for the first six weeks. Actually, for the first two-and-a-half months that he was waking up every two hours, except for one occasion." According to Lisa, when T.E.R. was an infant, Mandy did not feed him, change his diapers, rock him, or prepare his bottles. She stated that Mandy would take T.E.R. to school, but she did not do it every day.

In addition, Lisa said that Mandy's testimony regarding her relationship with T.E.R. and her involvement in T.E.R.'s life was "not true." She maintained that Mandy may have dressed T.E.R. on occasion, but she did not buy his clothes. According to Lisa, Mandy was too scared to bathe T.E.R. until he was two years old. In addition, Lisa stated that she did not believe that Mandy had always put T.E.R. first. She said that when Mandy did have contact with T.E.R., she worried

16

about his mental and physical safety and that some of Mandy's decisions regarding T.E.R. were inappropriate.

As the trier of fact, the trial court is the sole judge of the credibility of the witnesses and the weight to be given to the evidence. *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). Apparently, the trial court found that in relation to Mandy's contacts with T.E.R, Mandy's testimony was more credible than Lisa's testimony. We cannot say that the trial court abused its discretion in doing so. Consequently, when we consider and weigh all of the evidence, we conclude that there was factually sufficient evidence to support the trial court's findings.

3. **Do the Facts as Found by The Trial Court Rise to the Level of "Substantial Past Contact" Necessary to Create Standing Under Section 102.005(5)?**

Lisa also contends that the contact Mandy had with T.E.R. as found by the trial court does not rise to the level of "substantial past contact" under Section 102.005(5) because "[t]he contacts with [T.E.R.] by Mandy after her divorce from Lisa are simply those of any other conservator who does not have primary custodial responsibility and the majority of physical 'face-time' with a child, but rather has structured access and possession." Lisa cites no authority for this proposition and does not explain why the typical contacts between a joint managing conservator and a child under her care, custody, and control are insufficient to constitute "substantial past contact" for purposes of standing under Section 102.005(5). Indeed, we cannot conceive of any type of contact a petitioner could have that would be more substantial than the contacts between a joint managing conservator and a child under her care, custody, and control.

17

That said, Lisa erroneously narrows our consideration of Mandy's relationship and contacts with T.E.R. to the time period following Lisa and Mandy's divorce, while completely ignoring their relationship prior to that time. The record is replete with evidence demonstrating that Mandy had substantial contact with T.E.R., beginning with the day he was born. Mandy fed him, clothed him, rocked him, bathed him, gave him his medications, and, in general, took care of his everyday needs. The evidence also showed that Mandy continued to care for T.E.R. when he was a toddler and during his early childhood years. She attended all of his birthday parties and spent time with him during holidays. Mandy was present when T.E.R. learned to walk and talk, and she had helped him achieve those milestones. Mandy was involved in T.E.R.'s education and paid for much of his school tuition, his school supplies, and his school lunches. Mandy accompanied T.E.R. to his doctor's appointments, and she attended his extracurricular activities, such as soccer practices. And, significantly, Mandy did all of these things at a time when she, Lisa, and T.E.R. lived together as a family unit.[12]

Consequently, we find that the contact that Mandy had with T.E.R. constitutes "substantial past contact" under Section 102.005(5). We overrule Lisa's first point of error.

## III. The Trial Court Did Not Err in Its Best-Interest Finding

In her second point of error, Lisa contends that the trial court erred when it found it was in T.E.R.'s best interest to grant Mandy's petition for adoption. We disagree.

---

[12]*See supra* note 7, finding of fact number 7. We make no opinion whether these same actions would constitute substantial past contact under Section 102.005(5) if carried out by someone other than a member of the family unit.

18

## A.      Standard of Review and Applicable Law

Section 162.016(b) of the Texas Family Code states that "[i]f the court finds that the requirements for adoption have been met and the adoption is in the best interest of the child, the court shall grant the adoption." TEX. FAM. CODE ANN. § 162.016(b). The decision to grant or deny a petition for adoption is within the discretion of the trial court, and an appellate court may not set aside the decision except for an abuse of discretion. *In re W.E.R.*, 669 S.W.2d 716 (Tex. 1984). When determining whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; that is, whether the court's actions were arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). For our analysis, we consider whether the court had sufficient information upon which to exercise its discretion and whether it erred in is application. *Newell v. Newell*, 349 S.W.3d 717, 720–21 (Tex. App.—Fort Worth 2011, no pet.).

As our sister court has explained,

> In determining questions of adoption[,] the primary consideration is the best interest of the child[,] and where there is no jury[,] broad discretion is entrusted to the trial court, who has the opportunity to observe the appearance and demeanor of the witnesses, to evaluate the personality of the claimants, and to assess the needs of the child.

*Hopper v. Brittain*, 612 S.W.2d 636, 638 (Tex. App.—Houston [14th Dist.] 1981, no pet.) (citations omitted). The appellate court continued, "[I]t is clear that it matters not what we might have done under the circumstances had we heard the evidence; we are only allowed to determine, after the trial court has acted, whether there was an abuse of discretion." *Id*.

19

**B.      Analysis**

Specifically, Lisa maintains that Mandy's adoption of T.E.R. would not be in his best interest for the following reasons:

> Mandy agreed to skirt Texas family law prohibitions concerning same-sex marriage by traveling to Connecticut to marry Lisa.[13]  Mandy has been unable to show any stability in her life after the divorce from Lisa.  She has married and then divorced, Kelly Ryan.  Mandy's testimony concerning her divorce from Kelly so concerned the judge that he gave her precautionary <u>Miranda warnings</u>.[14]  She has continuously brought litigation concerning [T.E.R.], and vows on the record to continue to be a vexatious litigant until she gets her way.[15]
>
> Mandy has treated [T.E.R.] as a "prize" that she wants to win.  And someday [T.E.R.] will read this record and ask Mandy[,] "WHY?"

After the trial court conducted its hearings on the matter, it entered an order requiring Tracy Brown, a licensed clinical social worker, to perform an adoption evaluation.  On April 18, 2019, Brown's social study report was filed with the court.  As it related to Mandy, Brown determined, among other things, that:  (1) Mandy lived in a clean four-bedroom home, with a fenced back yard; (2) Mandy did not graduate from high school, but she received her General Education Diploma (GED) thirteen days after her school's graduation; (3) Mandy was a lifetime resident of Longview;

---

[13]This evidence is of little, if any, importance to our analysis of the "best interest" factor.  Regardless, Lisa's accusation that Mandy "skirt[ed] Texas family law prohibitions concerning same-sex marriage" is equally applicable to Lisa.

[14]Mandy married Kelly Krinshaw Ryan in January 2018, and the two divorced in May 2018.  Mandy and Kelly had no biological or adopted children, but Kelly had one daughter, P.R., prior to marrying Mandy.  Despite being divorced, Kelly and P.R. continued to live in Mandy's home.  Mandy had her own bedroom, as did T.E.R., Kelly, and P.R. During the hearing, the trial court cautioned Mandy about her testimony regarding her divorce from Kelly.  To the extent Mandy's testimony regarding the divorce was relevant to our examination of the entire record, we do not find it dispositive of the issue before the Court.

[15]Lisa mischaracterizes the trial court's warning to Mandy.  The trial court did not give Mandy the *Miranda* warnings which are provided to people who have been arrested.  Rather, he merely informed her that she had a right not to incriminate herself under the Fifth Amendment to the United States Constitution. Apparently, the trial court was concerned that Mandy's testimony in this case may have differed from her previous court testimony during her divorce from Kelly.  While this fact may have affected the trial court's credibility determination, the mere fact that it warned Mandy of her right not to incriminate herself is not, in and of itself, dispositive of the best interest issue.

(4) Mandy took prescription medication for a chronic medical condition, including Zoloft, which assisted with the anxiety she suffered due to her medical condition; (5) following the divorce, Mandy attended counseling services with T.E.R.; (6) since 2003, Mandy had been employed as a commissioned police officer;[16] and (7) Mandy carried health and life insurance.

On April 5, 2019, Brown made her first visit to Mandy's home. She reported,

> [Mandy, T.E.R, Kim, and P.R.] were all present in the home during the visit. [T.E.R.] was observed at the time of the investigation interacting with everyone in the home. [T.E.R.] played outside and inside during the visit. [T.E.R.] was active and playful throughout the visit and was seen to be affectionate with [Mandy] throughout the visit. [T.E.R.] appeared happy and healthy. [T.E.R.] wanted [Mandy] to play with him and watch him throughout the visit. [Mandy] was seen to have good parenting skills in redirecting [T.E.R.] and encouraged [T.E.R.] to wait until after the visit and [she] would play. [T.E.R.] played well with [P.R.] and has a house full of toys as well as a yard full of age appropriate toys. [T.E.R.] was polite and talkative. . . . [Mandy] is committed to being a parent to [T.E.R.] and doing whatever is needed to help [him] live a full[,] healthy life.

Moreover, Brown's summary also showed that T.E.R. had positive relationships with Mandy's family members. In concluding her report, Brown recommended that Mandy's petition for adoption be granted.

When we consider the testimony from the hearings, along with the results of Brown's evaluation, we find that (1) the court had sufficient information upon which to exercise its discretion and (2) it did not err when it found that it was in T.E.R.'s best interest for Mandy to adopt him. *See Newell*, 349 S.W.3d at 720–21.

We overrule Lisa's second point of error.

---

[16]When Mandy did not have T.E.R., she also took on part-time employment as a security guard. Mandy's annual salary was approximately $80,000.00.

21

## IV.    Conclusion

We affirm the trial court's judgment.

Ralph K. Burgess
Justice

Date Submitted:    January 8, 2020
Date Decided:    April 9, 2020