21 S.W.3d 925 (2000)
In the Interest of M.T. and K.T., minor children.
No. 09-99-333 CV.
Court of Appeals of Texas, Beaumont.
Submitted May 18, 2000.
Decided August 3, 2000.
*926 Clyde Herrington, Dist. Atty., J. Dawn Armstrong, Asst. Dist. Atty., Lufkin, for appellants.
Luan Tatum, Lufkin, for appellee.
Before WALKER, C.J., BURGESS and STOVER, JJ.

OPINION
RONALD L. WALKER, Chief Justice.
The Texas Department of Protective and Regulatory Services appeals a decree granting the adoption of two minor children, M.T. and K.T., by their former foster parents, Rickey Lee Roberts and Carolyn Louise Roberts. The Department presents three issues on appeal. We affirm.
Issue one contends, "The trial court erred in granting the Roberts' petition to intervene contrary to the requirements of § 102.003(2) of the Texas Family Code." The Department instigated this litigation with the filing of the original suit affecting parent-child relationship on January 29, 1997. Eighteen months later, the Roberts filed their petition for intervention seeking to be named managing conservators of the children. After the parental rights of the natural parents were terminated, the Roberts filed a petition for adoption. The following day, the trial court denied the Department's motion to strike the intervention.
The Department argues the Roberts lacked standing to intervene because they do not qualify under any of the categories listed in Section 102.003 of the Texas Family Code. See TEX. FAM.CODE. ANN. § 102.003(a) (Vernon Supp.2000). There is a distinction between bringing an original suit and intervening in an existing suit. Section 102.003 states who may file an original suit affecting parent-child relationship. The Department filed the original suit in which the Roberts intervened. The Family Code provides that the court may grant leave to intervene to any person deemed by the court to have had substantial past contact with the child. TEX. FAM. CODE ANN. § 102.004 (Vernon Supp.2000). Furthermore, the Roberts had standing to request adoption if the court deemed them to have had substantial past contact with the child. TEX. FAM.CODE ANN. § 102.005 (Vernon 1996).
The cases cited by the Department do not support its position. In Mendez v. Brewer, 626 S.W.2d 498, 500 (Tex.1982), the Supreme Court held the foster parents lacked standing to intervene in the termination proceedings because their only interest in the child was their desire to adopt him. The decree being appealed is the adoption decree; the Roberts' standing to intervene in the termination proceeding is of no consequence in the subsequent adoption proceeding. The court in Young v. Young, 693 S.W.2d 696 (Tex.App.-Houston [14th Dist.] 1985, writ dism'd), held the grandparents had standing to intervene in *927 the divorce suit, although they would not have had standing to bring an original suit. In Pratt v. Texas Dept. of Human Resources, 614 S.W.2d 490 (Tex.Civ.App.-Amarillo 1981, writ ref'd n.r.e.), the court held the prospective adoptive parent lacked standing to file a motion to modify conservatorship where he had not been a party to the original appointment proceeding. The court of appeals recognized precedent giving standing to any person to maintain an adoption suit, but distinguished that authority from motions to modify conservatorship. Id. at 495-96. In Interest of Garcia, 944 S.W.2d 725 (Tex. App.-Amarillo 1997, no writ), the court of appeals held the child's babysitters lacked standing to bring an original suit for conservatorship. Likewise, Jones v. Fowler, 969 S.W.2d 429 (Tex.1998), and Williams v. Anderson, 850 S.W.2d 281 (Tex.App.-Austin 1993, writ denied), resolved issues of standing to initiate a suit affecting parent-child relationship.
A party who does not qualify to initiate a suit affecting parent-child relationship may be permitted to intervene in a suit filed by a qualified party. In re Johnston, 957 S.W.2d 945, 948 (Tex.App.-Beaumont 1997, orig. proceeding); McCord v. Watts, 777 S.W.2d 809, 811 (Tex.App.-Austin 1989, no writ). Sound policy underlies the Legislature's creation of a relaxed standing rule subject to court discretion for intervention in an existing suit. Where a suit is already pending, concern for the privacy of the parties is subordinate to the overriding concern for the best interest of the children. See Segovia-Slape v. Paxson, 893 S.W.2d 694, 696-97 (Tex.App.-El Paso 1995, orig. proceeding).
K.T. was four months old and M.T. was two-and-one-half years old when they moved into the Roberts' home as their foster children. The children lived with the Roberts for over fourteen months. The record supports the trial court's implied finding of past substantial contact sufficient to authorize their petition under Family Code §§ 102.004-.005. Point of error one is overruled.
Point of error two contends, "The trial court erred in granting Intervenors' petition to adopt M.T. and K.T. in that there was insufficient evidence to support the court's determination that the managing conservator wrongfully withheld consent to the adoption." The managing conservator's written consent to the adoption is required unless the court waives the requirement with a finding that consent is being refused without good cause. TEX. FAM.CODE ANN. § 162.010(a) (Vernon 1996). Point of error three urges, "The court erred in granting Intervenors' petition to adopt M.T. and K.T. in that there was insufficient evidence to establish that granting the Roberts' petition to adopt was in the best interest of M.T. and K.T. and overwhelming evidence presented to the contrary." We will address these issues together because they require an extensive recitation of the evidence.
At one point the Department's plan was for the Roberts to adopt M.T. and K.T. The periodic reports spoke glowingly of the condition of the girls and their environment. The Roberts had successfully fostered nine children and adopted three other children, D.R., A.R., and R.R. Then an anonymous hot-line call caused the Department to begin an investigation into the treatment of D.R. in March 1998. The investigation concluded with a finding that the Department was "unable to determine" that any abuse had occurred. By that time, however, M.T. and K.T. had been removed from the Roberts' home and placed with new prospective adoptive parents. Two subsequent placements failed. At the hearing conducted December 14, 1998, the girls' current foster mother informed the court permanent placement with her family was not an option and asked that a new placement be made soon.
At a hearing conducted August 14, 1998, Crystal Voelker, a woman who worked for the Roberts from January to March of *928 1998, testified she had observed Carol Roberts hitting D.R. and M.T. Carol Roberts denied the allegation. Paula Caswell, who worked for the Roberts at the same time, directly controverted Voleker, testifying she had never seen Carol Roberts hit or mistreat the children in any way. Voelker did not testify at the adoption hearing, and by December 1998 the Department was no longer suggesting Mrs. Roberts physically abused any of the children.
During the investigation, however, a woman named Kim Branson had a conversation with severe consequences for the Roberts. At the adoption hearing, Branson testified she was friends with the Roberts when R.R. was a baby and D.R. was two. As a newborn, A.R. resided with her mother in the Bransons' home. When the Roberts adopted A.R., Kim Branson decided to pull away from the Roberts so that she could sever her bond with A.R. and the Roberts could establish their relationship with the baby she loved. Branson insisted that she had no concerns about D.R. being physically abused by the Roberts, although she had seen Rick Roberts pull on D.R.'s ear once seven years ago. Branson has never been in the Roberts' home when M.T. and K.T. were there, and she has no concerns about the Roberts' ability to care for children.
In March 1998, Branson told her friend Judy Semlinger that she had seen Rick pull D.R.'s ear once, but that she had never seen the Roberts spank or strike any of their children. The matter came up as gossip between Branson and Semlinger in the course of a conversation about something else entirely. When Semlinger mentioned Carol had been in her office crying, Branson stated Carol's stress level was concerning to her. The source of that concern was a girl who worked for the Roberts who gossiped that D.R. had ADHD or ADD. Branson insisted she did not tell Semlinger that she did not go over to the Roberts because of the way they treated D.R. Not until she was told she had to appear in court did Branson realize she had been misinterpreted.
Judy Semlinger is the CASA worker assigned to M.T. and K.T. She testified M.T. was very immature and behind developmentally when she was first placed with the Roberts, and definitely grew while she was with the Roberts. No concerns arose during her monthly visits. Although Branson has since advised her that it is not what she meant, Semlinger "heard" Branson no longer visits with the Roberts because of the way they treat D.R. and told Theresa Martinez about the conversation. Theresa Martinez is a case worker for the Department assigned to M.T. and K.T.
Before the investigation, Semlinger was confident the Roberts' home was a permanent and secure placement for M.T. and K.T. The girls bonded with Carol and Rick and the Roberts' siblings. In 14 months there was no concern with meeting the needs of the children, even with a child with ADD. She never saw any conscious favoritism of one child over another.
Teri Keith's report of the investigation on D.R. changed Semlinger's mind about the adoption. Also, during the investigation she had a conversation with Carol Roberts in which they discussed the difficulties of going to school, parenting, and trying to open a day care. Roberts was very upset and distraught. Now Semlinger doesn't know if the Roberts have the time and the energy for M.T. and K.T. She admitted the stress of building the day care and the stress of the investigation was over by the time of the hearing, and she had not been to the Roberts' in 9 months.
Teri Keith is the Department caseworker who conducted the investigation concerning D.R. Keith related hearsay that there were folks who no longer visited the Roberts because of the way they treat D.R. Although she was unable to determine D.R. had been abused by the Roberts, she was concerned that D.R. seemed *929 to be a bit too much for them to handle at that time, along with opening a new day care. D.R. just won't sit still, and was disciplined more because he acted out. Although Keith admitted she didn't know much about M.T. and couldn't make a judgment on the amount of attention she needed, the children mentioned once that their mother "pops" M.T. for wetting herself. Carol related that M.T. had toileting problems after visits with her biological parents, which Roberts claimed she addressed by not letting M.T. watch cartoons. Keith was concerned that Mrs. Roberts punished M.T. for behavior with an emotional connection. She had no concerns regarding K.T.
Juanda Morgan is the licensed counselor who began working with M.T. in August 1998, some five months after she had been removed from the Roberts' home. M.T. used a tub of water and sand in play therapy that indicated a high probability of mistreatment. One of the new foster mothers indicated M.T. would have potty accidents that weren't accidents the day after visits with the Roberts. Morgan would receive a flat response from M.T. when she mentioned Mrs. Roberts. M.T. was less clinging with the new foster mother than with Roberts. Morgan did not conclude the Roberts were doing anything inappropriate with M.T. or that they don't care about her, but with two high-needs kids she had some doubts about whether they can provide the consistent dose of attention M.T. needs.
Nothing came up to lead Morgan to believe that there was an abusive situation for M.T. in the Roberts' home. She did not conclude there was a problem in the way the Roberts were treating M.T., but the visitation with them while the girls were living with the new foster family was "backing her up." Morgan felt M.T. was regressing. She acknowledged the Department's quarterly reports gave no indication this regressive behavior existed prior to removal from the Roberts' and admitted M.T.'s disturbing behavior could be because "she just wants to go home" or "can't figure out where home is."
Judy Bowman, the child placement supervisor, based her opinion that adoption was not in the children's best interest on Teri Keith's report and on a single contact with the Roberts family, when the girls were removed from their home. K.T. was crying, but M.T. just sat in the vehicle. Carol Roberts was hugging the crying K.T. "in agony." Bowman felt Carol Roberts was partial to K.T.
Michelle Massingill, a friend who visited the Roberts' home regularly between October 1997 and January 1998, testified the Roberts do not exhibit partiality to either of the children. D.R. is not treated any worse than the others; he's just excitable and the Roberts can control him. M.T. isn't left out in the Roberts' home. Massingill said she is at the Roberts' three or four nights a week and has never seen either one of them spank any of the children. She never saw Carol mistreat M.T. during potty training. According to Massingill, the most frequent form of discipline was time-out.
Carolyn Roberts testified D.R has ADD, is on medicine and is doing fine. Now D.R. is on the A-B honor roll and participates in sports. She was licensed to keep children in her home, but they built the day care center so she could continue to foster M.T. and K.T. She has six employees, and personally stays in her office in her house. Roberts admitted she's never been under as much stress as she has been under "fighting through all this." She has a parent-child relationship with both M.T. and K.T. As was the case when they adopted D.R. and R.R., the older child took longer to bond than did the infant because "they're not going to let go as easily as an infant that's never known that torment of being torn apart" from the family. Her children already consider M.T. and K.T. to be their sisters.
*930 Judy Semlinger echoed Roberts's testimony about the level of bonding between the girls and the Roberts. K.T. is "totally bonded" to Carol, the only mother she has ever known. The girls were still bonded to the Roberts after nine months of separation. Semlinger noted the children are very confused. In her words, "I think we've already created great dangers and, you know, I don't know what the right answer is."
Sandra Cain, the Lufkin State School superintendent, conducted the social study. She interviewed both of the Roberts, the Department workers, both sets of foster parents, and the counselor. She observed the children in the Roberts' home for one hour and observed the current foster home. Cain found no element of danger to the children in the Roberts' home, and saw no indication they were going to be physically mistreated or emotionally abused, or that such things might be possible. She recommended placement other than with the Roberts because M.T. had improved since she left the Roberts and she had concern about the Roberts' ability to parent two more children in addition to the three they already had. She observed D.R. looking to the adults for attention rather than interacting with the other children, and thought M.T.'s best setting would be where she wouldn't have to compete for adult attention. She did not notice any difference in the way the Roberts deal with any of the children, nor did she observe any different degree of bonding between the children and the Roberts. K.T. exhibited no emotional or developmental problems. Cain agreed there is an element of danger in taking two-year-old K.T. from the only mother she had ever known, but felt it was in her best interest for her to remain with her sister. She admitted the transitions from family to family to family to family were not carefully conceived and implemented.
The Department argues its experts recommended the petition for adoption be denied because placing the children with the Roberts is not in the best interest of the children. What began with alarm over possible abuse in the home dissipated into possible preference for the youngest child that dissolved into concern over the presence of an over-active child in the home. They recommended the Roberts not be allowed to adopt M.T. and K.T. because they did not know whether the Roberts had the time and the energy to devote to M.T. in spite of evidence that they did precisely that for fourteen months and, but for the trauma of separation, had improved their home environment. The trial court could conclude the initial claim of abuse was false, that Mrs. Roberts loved both M.T. and K.T., that the only rational placement for K.T. was with the Roberts and that the best placement for M.T. was with the Roberts even if she would not receive their undivided attention. The trial court's finding that granting the Roberts' petition to adopt M.T. and K.T. is in the best interest of the children is supported by sufficient evidence. The evidence preponderating against such a finding does not compel a contrary conclusion. We hold the trial court did not abuse its discretion in waiving the Department's consent to the adoptions. Points of error two and three are overruled. We affirm the judgment.
AFFIRMED.