# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE 294TH* |
| *R.I. AND M.I.,* | § | *JUDICIAL DISTRICT COURT* |
| *CHILDREN* | § | *VAN ZANDT COUNTY, TEXAS* |

## *OPINION*

Megan Clayton (Megan) appeals from the trial court's order granting the Department of Family and Protective Services' (the Department) motion to strike Megan's Petition for Adoption of two minor children, R.I. and M.I.[1] Megan presents two issues for our consideration. We affirm.

## BACKGROUND

In April 2018, the Department filed an original petition for the protection, conservatorship, and termination of parental rights in the interest of R.I. and M.I (the original suit). The children's paternal aunt and uncle by marriage, Megan and Joshua, intervened in the suit and asked the trial court to place the children in their care.[2] The Department conducted a home study with Megan and Joshua but declined to place the children with Megan and Joshua because the home study uncovered undisclosed law enforcement contact and undisclosed prior allegations by Megan of domestic violence by Joshua. The children were placed with another relative for a period of time and were returned to their biological mother for a period of time. The ultimate result of the original suit was the termination of both the biological mother's and

---

[1] Megan Clayton and R.I. and M.I. are pseudonyms to protect the identity of the minor children that are the subject of this suit.

[2] Megan's husband Joshua (a pseudonym) was a party to her original petition and motion for temporary orders. Joshua is not a party to this appeal.

father's parental rights and the appointment of the Department as the children's managing conservator.

Megan filed this original petition for adoption of R.I. and M.I. within ninety days of the termination of the children's biological parents' rights.[3] In her petition, Megan alleged that R.I. and M.I. currently resided with her and Joshua. The Department filed a special exception and motion to strike evidentiary facts from Megan's pleadings, challenging Megan's statements that the children resided with her. Megan amended her petition and removed the statement that R.I. and M.I. currently resided with her. The Department filed a subsequent motion to strike on grounds that Megan did not have standing to petition the court to adopt R.I and M.I.[4]

In addition to her petition for adoption, Megan filed a motion for temporary orders asking the trial court to allow Megan to visit R.I. and M.I. while the case was pending. The Department asked the trial court to deny Megan's request for temporary orders on grounds that Megan had not demonstrated standing to seek adoption and visitation with the children.

On February 25, 2020, the trial court conducted a hearing on the Department's motion to strike Megan's petition for adoption based on lack of standing. At that hearing, Megan, Joshua, and the children's paternal grandparents (Megan's mother and stepfather) testified about Megan's past contacts with the children. Jason Veihl, a Department conservatorship caseworker assigned to the case, and Brandi Goen, the court appointed special advocate, testified about their involvement with Megan and Joshua during the original suit and the past contact Megan disclosed during meetings and hearings in the original suit. Ultimately, the trial court found that Megan and Joshua did not have substantial past contact with R.I. and M.I. to confer standing to seek adoption. This appeal followed.

## CONSIDERATION OF PRIOR TESTIMONY

In Megan's second issue she contends that the trial court erred in considering her testimony in the original suit in determining her credibility. Megan argues that "[a] court may not take judicial notice of a witness's testimony based on the trial judge's own memory of the testimony." *See Davis v. State*, 293 S.W.3d 794, 797 (Tex. App.—Waco, no pet.); *see also Guyton v. Monteau*, 332 S.W.3d 687, 693 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

---

[3] *See generally* TEX. FAM. CODE ANN. § 102.006 (West 2019).

[4] *See generally id.* § 102.005 (West 2019).

Megan further argues that "statements or events that occur in the presence of a judge but outside a judicial proceeding are not subject to judicial notice." *See Ex Parte Rains*, 555 S.W.2d. 478, 481 (Tex. Crim. App. 1997). According to Megan, "the [t]rial [j]udge opined in his ruling '[a]nd probably most important, there was contradictory evidence from the testimony that [Megan] presented today and the sworn testimony that she has given in a sworn affidavit or in prior court hearings.'" She maintains that the trial judge erred in relying on her memory of prior proceedings "or worse the memory of others." Megan argues that this error resulted in the trial judge doubting her credibility for inappropriate reasons and "[f]or this reason alone the case should be remanded for further proceeding free from this error."

The Department argues that Megan's brief mischaracterizes the trial court's actions. We agree. The trial court heard from several witnesses at the hearing, whose testimony will be further discussed below. Veihl and Goen both testified that Megan admitted to lying about domestic violence in an affidavit she filed in a divorce proceeding against Joshua in a court hearing that occurred during the original suit. At the hearing in this case, Megan acknowledged filing for divorce from Joshua in 2015. As part of that divorce proceeding, Megan filed a sworn affidavit alleging that Joshua physically abused her. Megan and Joshua did not divorce and were still married at the time of the hearing. The Department's counsel questioned Megan regarding the affidavit, and Megan testified that her allegations in the affidavit were "extremely exaggerated" due to emotional distress she suffered from the death of her grandmother. Upon further questioning, Megan admitted that she lied in the affidavit. Megan further admitted to testifying that she lied in the affidavit in a court hearing in the original suit. Joshua testified that he had never read the affidavit but believed Megan was trying to "beef up" her case for the divorce.

Thus, our review of the record does not demonstrate that the trial judge took judicial notice of a witness's testimony based on her own memory of the testimony. *See Davis*, 293 S.W.3d at 797. In fact, the record demonstrates that the trial court heard Megan admit to lying in a sworn affidavit she filed in the previous divorce proceeding and admit to testifying that she lied in the affidavit in a court hearing in the original suit. Because Megan admitted to previously lying under oath on previous occasions, there would be no need for the trial court to take judicial notice of testimony from the original suit. We overrule Megan's second issue.

3

In Megan's first issue, she argues that the trial court erred when it found that she did not have standing to petition the court to adopt R.I. and M.I.  She argues that the evidence did show substantial past contact between herself, R.I., and M.I.

## Standard of Review and Applicable Law

Subject matter jurisdiction is essential to the authority of a court to decide a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 443 (Tex.1993).  Standing is implicit in the concept of subject matter jurisdiction.  *Id.*  Whether a party has standing to maintain a suit is a question of law**.  *Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 855 (Tex. 2002); *In re A.J.L.,* 108 S.W.3d 414, 419 (Tex. App.–Fort Worth 2003, pet. denied).  To have standing, the pleader bears the burden of alleging facts that affirmatively demonstrate the court's jurisdiction to hear the cause.  *Tex. Ass'n of Bus.,* 852 S.W.2d at 446.  In our review of standing, we take the factual allegations in the petition as true and construe them in favor of the pleader.  *Juarez v. Texas Ass'n of Sporting Officials, El Paso Chapter*, 172 S.W.3d 274, 278 (Tex. App.–El Paso 2005, no pet.).  Besides the pleadings, an appellate court may also consider relevant evidence and must do so when necessary to resolve the jurisdictional issues raised.  *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000).

Standing to sue may be predicated upon either statutory or common law authority. *Everett v. TK–Taito, L.L.C.*, 178 S.W.3d 844, 850 (Tex. App.—Fort Worth 2005, no pet.).  When standing has been statutorily conferred, the statute itself serves as the proper framework for a standing analysis.  *Id.* at 851.

Typically, "a party's standing to seek relief is a question of law we review *de novo*." ***In re S.M.D.*, 329 S.W.3d 8, 12-13 (Tex. App.—San Antonio 2010, pet. dism'd).  This is particularly so in instances where standing is conferred by statute because resolution of the issue turns on statutory construction.  *In re S.A.M.*, 321 S.W.3d 785, 788 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (noting that, "[i]n statutory standing cases, ... the analysis is a straight statutory construction of the relevant statute to determine upon whom the Texas Legislature conferred standing and whether the claimant in question falls within that category.").

Nevertheless, some statutes "provide[ ] a list of person[s] who automatically have standing to bring an original suit," whereas others list individuals who have standing upon proving additional statutory requirements by a preponderance of the evidence.  *Von Behren v.*

***Von Behren***, 800 S.W.2d 919, 921 (Tex. App.—San Antonio, 1990, pet. dism'd). Section 102.005(5) of the family code grants standing to persons who can prove the additional statutory requirement of "substantial past contact" with the child by a preponderance of the evidence. TEX. FAM. CODE ANN. § 102.005(5) (West 2019); *see also **S.M.D.***, 329 S.W.3d at 13. What constitutes "substantial past contact" is not defined by statute or caselaw, and the inquiry into whether a party has had "substantial past contact" with a child is fact-intensive and should focus on the amount of actual contact. ***In re C.M.C.***, 192 S.W.3d 866, 871 [Tex. App.—Texarkana 2006); *see also **Chavez v. Chavez***, 148 S.W.3d 449, 456 (Tex. App.—El Paso 2004, no pet.) (grandparents had standing to intervene when children lived with them for over a year); ***In re A.M.***, 60 S.W.3d 166, 168 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (foster parents had standing when seventeen-month-old child resided with them for fourteen months); ***In re M.T.***, 21 S.W.3d 925, 926 (Tex. App.—Beaumont 2000, no pet.) (foster parents had standing to intervene after children lived with them for fourteen months); ***In re Hildalgo***, 938 S.W.2d 492, 495–96 (Tex. App.—Texarkana 1996, no writ) (stepmother had standing to file petition for managing conservatorship when she and child were close since child's birth and child resided with her). Although standing is typically a pure question of law, whether a party has standing to adopt under Section 102.005(5) is a mixed question of law and fact. ***Interest of T.E.R.***, 603 S.W.3d 137, 142 (Tex. App.—Texarkana 2020, no pet.).

In cases involving mixed questions of law and fact, we apply a hybrid standard that incorporates elements of both factual and legal standards of review. ***Delfingen U.S.-Tex., L.P. v. Valenzuela***, 407 S.W.3d 791, 799 (Tex. App.—El Paso 2013, no pet.); *see also **Iliff v. Iliff***, 339 S.W.3d 126, 133-34 (Tex. App.—Austin 2009), *aff'd*, 339 S.W.3d 74 (Tex. 2011) (holding that in considering "issues of child support, division of the marital estate, and child custody, possession, and visitation," appellate courts "employ a hybrid analysis"). Under this standard,

> [T]he appellate court defers to the trial court's factual determinations supported by the record and reviews legal conclusions de novo. The reviewing court does not engage in its own factual review, but decides whether the record supports the trial court's resolution of factual matters. If the record supports the trial court's resolution of factual matters, the reviewing court is not at liberty to disturb them. A reviewing court instead determines whether the trial court properly applied the law to the facts in reaching its legal conclusion. It does not defer to the trial court on questions of law.

5

*Valenzuela*, 407 S.W.3d at 799 (citations omitted); *see Iliff*, 339 S.W.3d at 134 (holding that appellate courts "engage in a two-pronged inquiry asking first, whether the trial court had sufficient information upon which to exercise its discretion, and second, whether the trial court erred in its application of discretion.").

Consequently, because the issue of whether a person has standing under Section 102.005(5) of the family code is a mixed question of fact and law, we review the trial court's ruling in this case under the hybrid standard. *T.E.R.*, 603 S.W.3d at 143. Under that standard, we first evaluate whether there is any supporting evidence in the record that the petitioner had past contact with the child. *Id.* If there is no evidence that the petitioner had any past contact with the child, then we will find that the petitioner failed to establish standing to sue under Section 102.005(5) as a matter of law. *Id.* If the evidence is undisputed about the nature and degree of the petitioner's past contact, then we determine whether that evidence constitutes "substantial past contact" as a matter of law. *Id.* Under either of the above scenarios, we give no deference to the trial court's legal conclusion and decide the question de novo. *Id.*

However, if there is a dispute about the nature and degree of the petitioner's past contact with the child, then the trial court must consider the evidence and resolve that fact question. *Id.* On appeal, we will "not engage in [our] own factual review, but [will] decide[ ] whether the record supports the trial court's resolution of factual matters." *Id.* (quoting *Valenzuela*, 407 S.W.3d at 799–800). If we determine that there is support for the trial court's findings of fact, then we will decide whether those facts rise to the level of "substantial past contact" as a matter of law. *T.E.R.*, 603 S.W.3d at 143. In deciding that legal issue, we give no deference to the trial court's legal conclusion but decide the question de novo. *Id.*

**The Evidence Regarding Past Contact**

It is undisputed that Megan is the children's paternal aunt and that R.I. and M.I. were eight and six years old respectively at the time of the hearing on Megan's standing to bring her petition for adoption in this case. Further, it is undisputed that the children never resided with Megan, except for a period of four days they spent with her prior to Megan turning the children over into the Department's custody. Moreover, it is undisputed that Megan has not seen R.I. and M.I. in the two years prior to the hearing.

Several witnesses testified at the hearing on Megan's petition for adoption. In addition to Megan, Joshua, and Megan's parents, Cole and Jane, testified about Megan's and Joshua's past contact with the children.[5]

Megan testified that she lived approximately five miles from her parents. The children and their biological parents lived on the lot next door to Cole and Jane. Megan testified that Jane was the children's primary caretaker. She stated that, prior to the termination of the biological parents' rights, she saw the children several times a week at Jane's house and she transported R.I. to school once or twice a week when R.I. was in kindergarten. Megan testified that the children spent approximately one weekend per month at her home. Later in her testimony, she described the children's weekend visits as "very sporadic" and "never consistent." Megan testified that M.I. was fond of Joshua and liked to spend time with him. On cross examination, Megan confirmed that she attended multiple meetings through the Department and attended several hearings in the original suit. However, she admitted failing to disclose her past contact with the children to the Department, the court appointed special advocate, or the individual who interviewed her for the home study.

Joshua testified that he thought the children "spent the night a few times," but he did not recall "lots of times or anything." He stated that the children did not come visit for any long weekends, the children came over on holidays, and he took R.I. to school on occasion. Joshua testified that he believed R.I. would recognize him but was unsure if M.I. would recognize him.

Veihl and Goen both testified that Megan had an opportunity to describe her contact with the children multiple times during meetings and hearings in the original suit. Nevertheless, according to Veihl and Goen, Megan only described contact with the children on holidays and during the four days prior to the Department taking the children into its custody.

Veihl testified that Megan was not considered an appropriate placement for the children during the original suit. He explained that, after the home study's completion, he became aware of Megan's previous contacts with law enforcement and her allegations that Joshua subjected her to domestic violence. Because Megan had not disclosed this information, Veihl testified that the Department was concerned about Megan's honesty. Veihl reviewed Megan's sworn affidavit alleging that Joshua committed domestic violence against her and he found the affidavit very concerning. Specifically, the statements in the affidavit were detailed and described a long

---

[5] Cole and Jane are pseudonyms.

history of domestic violence within the marriage. Veihl was particularly concerned because Megan described a specific date of domestic violence in her affidavit and this date matched the date of a report from law enforcement. When Veihl asked Megan about the domestic violence allegations, she stated that "it happened." Veihl testified that he later heard Megan testify in a court hearing in the original suit that the domestic violence allegations were untrue. Veihl testified that this concerned the Department regarding the children's safety. Veihl testified that he had not told the children that Megan and Joshua were seeking to adopt them. He explained that the children have been in the Department's care since April of 2018 and have been placed with relatives only to be returned to foster care. Veihl testified that the children have overcome adjustment periods of bedwetting because of the severe trauma they experienced in the past. Veihl testified that the Department attempted a monitored return of the children to the biological mother, but the mother exposed the children to the biological father, which caused R.I. to become fearful and tell his court appointed special advocate. Veihl testified that R.I. is vocal about his fear of his biological father and the abuse that he witnessed "back and forth with the mother." He stated that the children having to return to foster care after the monitored return was especially traumatic. Veihl testified that the Department is concerned that another family placement, which could result in the children having to be removed and returned to foster care, would be especially traumatic for the children, who have already experienced "horrific" trauma.

**Analysis**

In this case there is a dispute about the nature and degree of Megan's past contact with the children. At the request of Megan, the trial court issued written findings of fact and conclusions of law in which the trial court stated:

> 6. [Joshua] and [Megan]...do not have substantial past contact with the children.
>
> 7. Any finding of fact that is a conclusion of law shall be deemed a conclusion of law. Any conclusion of law that is a finding of fact shall be deemed a finding of fact.

It is presumed that all fact findings needed to support the judgment were made by the trial judge. *Carter v. William Sommerville and Son, Inc.,* 584 S.W.2d 274, 276 (Tex. 1979). After the court files original findings of fact and conclusions of law, any party may file with the clerk of the court a request for specified additional or amended findings or conclusions. TEX. R. CIV. P. 298. Failure by a party to request additional amended findings or conclusions waives the

party's right to complain on appeal about the presumed finding. *Smith v. Smith*, 22 S.W.3d 140, 149 (Tex. App.—Houston [14th Dist.] 2000, no pet.). We will not engage in our own factual review but will decide whether the record supports the trial court's resolution of factual matters. *T.E.R.*, 603 S.W.3d at 143; *Valenzuela*, 407 S.W.3d at 799-800.

Megan argued at the hearing that "relatives who have cared for a child for as few as seven weeks have been found to have substantial past contact." On appeal, Megan cites *In re A.L.W.*, No. 02-11-00480-CV, 2012 WL 5439008 (Tex. App.—Fort Worth Nov. 8, 2012, pet. denied) (mem. op.) to support her contention that she has substantial past contact with R.I. and M.I. to establish standing to petition the court for adoption. In *A.L.W.*, the appellate court held that the intervenors demonstrated substantial past contact because the child had lived with the intervenors fulltime for seven weeks at the time they filed their intervention. 2012 WL 5439008, at *4. In holding that the intervenors established substantial past contact, the court noted that the length of time "is shorter than in many cases." *Id.*

As previously discussed, Megan admitted at the hearing to previously lying under oath. Megan's own testimony at the hearing regarding her past contact with the children was, at times, contradictory. Megan described the children staying overnight with her on the weekend on a monthly basis but later stated that the children stayed with her on the weekends sporadically, describing the weekend visits as "never consistent." Joshua testified that he didn't recall many overnight weekend visits with the children. Moreover, Megan described M.I. as being very fond of Joshua, yet Joshua testified he was unsure if M.I. would recognize him. Veihl and Goen testified that Megan described her past contact with the children as limited to holidays and the four days prior to the children being taken into the Department's custody. While the trial court did not specifically state in its written findings of fact and conclusions of law what specific contact the trial court believed Megan had with the children, we presume that all fact findings needed to support the judgment were made by the trial judge. *See Carter*, 584 S.W.2d at 276. Thus, the trial court could have found that Megan's contact with the children was as limited as holiday visits and the four consecutive days prior to the children being taken into the Department's custody.

Additionally, if the trial court had taken Megan's testimony as true, it would still have correctly found that Megan did not have substantial past contact with R.I. and M.I. The past contact found to be substantial in *A.L.W.* is distinguishable from the past contact Megan claims

to have had with R.I. and M.I.  It is undisputed that R.I. and M.I. never lived with Megan and that, as of the date of the hearing, Megan had not seen R.I. and M.I. in two years.  Taking Megan's testimony at face value, the contact in question would consist of: seeing the children at Jane's house several times a week for an unknown period of time, holiday visits, transporting R.I. to school once or twice weekly when R.I. was in kindergarten, monthly overnight visits over the course of the children's lives, and caring for the children for four consecutive days prior to the children being taken into the Department's custody.  In *A.L.W.*, the court noted that the trial judge has discretion to determine whether "those who undertake the day-to-day supervision of a child, her activities, and most of the functions ordinarily associated with legal custody have substantial past contact to confer standing to intervene."  *Id.* at \*5.  The record in this case contains no evidence that Megan was responsible for the day-to-day supervision of R.I. and M.I., their functions, and other functions ordinarily associated with legal custody for any substantial consecutive length of time or within the last two years.  Besides *A.L.W.*, the cases in which substantial past contact has been established involved considerably more contact than alleged in this case.  *See, e.g., Chavez,* 148 S.W.3d at 456 (standing to intervene when children resided with grandparents for over a year); *A.M.,* 60 S.W.3d at 168 (standing when seventeen-month-old child resided with foster parents for fourteen months); *M.T.,* 21 S.W.3d at 926 (standing to intervene when children  resided with foster parents for fourteen months); *Hidalgo,* 938 S.W.2d at 495–96 (step-grandmother had standing to file petition for managing conservator when she and the child had been close since birth and child resided with step-grandmother); *Hirczy v. Hirczy,* 838 S.W.2d 783, 786 (Tex. App.–Corpus Christi 1992, writ denied) (ex-husband of child's mother had standing when he resided with child for three years in the role as her father); *Rodarte v. Cox,* 828 S.W.2d 65, 69–70 (Tex. App–Tyler 1991, writ denied) (foster parents had standing to intervene when child  resided with them for over two years); *see also Segovia–Slape v. Paxson,* 893 S.W.2d 694, 696 (Tex. App.–El Paso 1995, no writ) (denial of writ of mandamus seeking leave to intervene when no evidence of substantial past contact, other than the allegation that child resided with the aunt for several weeks, was introduced).  Thus, we hold that Megan did not demonstrate substantial past contact with the children as a matter of law.  *See C.M.C.*, 192 S.W.3d at 872.  We overrule Megan's first issue.

<u>**DISPOSITION**</u>

Having overruled Megan's first and second issues, we ***affirm*** the trial court's judgment granting the Department's motion to strike Megan's petition.

<u>**JAMES T. WORTHEN**</u>
Chief Justice

Opinion delivered September 23, 2020.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

11



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**SEPTEMBER 23, 2020**

**NO. 12-20-00096-CV**

**IN THE INTEREST OF R.I. AND M.I., CHILDREN**

Appeal from the 294th District Court
of Van Zandt County, Texas (Tr.Ct.No. ADT1900024)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*